**SOUTHGATE MASTER FUND, LLC, by and through MONTGOMERY CAPITAL ADVISORS, LLC, its Tax Matters Partner, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. 3:06–CV–2335–K.**

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 18, 2009.

---

efforts benefitted the defendant.") (emphasis in original).

**71.** *See Stelax,* 2004 WL 733844, at *4–7.

M. Todd Welty, Claire Irene Wade, Sonnenschein Nath & Rosenthal LLP, Daniel H. Charest, Kenneth E. Gardner, Terrell W. Oxford, Susman Godfrey LLP, Dallas, TX, Justin Kattan, Sonnenschein Nath & Rosenthal LLP, New York, NY, Steven Merouse, Sonnenschein Nath & Rosenthal LLP, Chicago, IL, for Plaintiff.

Richard G. Jacobus, Justin S. Kim, Robert J. Kovacev, Washington, DC, David G. Adams, U.S. Department of Justice, Michael C. Prindible, Internal Revenue Service, Dallas, TX, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ED KINKEADE, District Judge.

This case is a tax dispute between Plaintiff Southgate Master Fund, LLC ("Southgate") and the United States of America (the "Government"). It is a civil action by the Plaintiff against the United States under 26 U.S.C. § 6226 for readjustment of partnership items. Based on the findings and conclusions set forth today, the Court holds that although Southgate's claimed capital loss appeared to fall within the literal terms of the statute, the transaction that created the high basis in the stock lacked economic substance and therefore must be disregarded for tax purposes. Consequently, the Internal Revenue Service correctly determined Plaintiff's reported loss was invalid. The Court further holds that because the calculation of taxes was done in good faith and with reasonable cause and the penalties assessed are otherwise inapplicable, the Plaintiff is not liable for the penalties sought by the Government.

In December 2008 and January 2009, the Court conducted a fifteen-day bench trial on this matter. The Court additionally asked the parties for extensive post-trial briefing and allowed the parties to file evidence. Thus, the Court, having heard the testimony of witnesses and the argument of counsel, hereby renders the following Findings of Fact and Conclusions of Law as permitted by Federal Rule of Civil Procedure 52(a).

### I. Findings of Fact

### A. Andrew Beal and Beal Bank's Business of Acquiring "Stressed Debt"

1. This case centers around banker D. Andrew Beal ("Beal"), and his partic-

ipation in a partnership transaction involving Chinese non-performing loans ("NPLs"), by which he claimed $1.1 billion in tax losses on his personal income tax returns across the years 2002–2004 based on an economic loss the Government estimates at about $10 million. Beal is Southgate's primary United States investor, and the person whose tax liability is ultimately at issue in this action. Beal is the founder, Chief Executive Officer, and 100 percent shareholder of Beal Financial Corporation ("BFC"), a Texas corporation and S-corporation for federal tax purposes, and its subsidiary Beal Bank, which in turn owns Beal Capital Markets, Inc.(collectively the "Bank"). Although Beal is a highly sophisticated and experienced banker, he has no professional or educational background in tax law. Beal is a Texas resident.

2. Beal Bank, a S-corporation, has been operating under the scrutiny of regulators since its inception in 1988. During that time, Beal Bank has been given "exemplary" ratings from its regulators.

3. Over the past twenty years, Beal and the Bank have been highly profitable, and have achieved significant returns on distressed assets originated by other financial institutions. The Bank's primary business is acquiring "stress debt," which Beal describes as "debt that has some issue with it ... performing loans that are out of favor ... or where the industries are stressed."

4. In its 2002 Report of Examination of Beal Bank, the Federal Deposit Insurance Corporation ("FDIC") confirmed Beal Bank's success, and the Bank's primary focus on acquiring distressed loans: "[Beal Bank's] earnings remain strong and well in excess of peer levels. Management is competent and skilled in the bank's primary business activity of acquiring distressed loan packages at a discount."

5. Both before and after founding Beal Bank, Beal individually (as opposed to on behalf of Beal Bank) had a long and, for the most part, successful history investing in distressed assets.

6. In many instances, Beal would purchase these assets based on limited research—including one instance where he acquired over 100,000 loans with a face value of approximately $20 million based on two days of investigation—if "the price was right."

**B. Thomas Montgomery and His Experience with Stressed Debt**

7. Thomas Montgomery ("Montgomery") is a certified public accountant with significant experience in venture capital transactions. In 2001, Beal Capital Markets, Inc. hired Montgomery to start a new capital markets group. The group's specific focus was identifying investment markets and opportunities where there existed a so-called "market disconnect" between the quality of assets and the price at which those assets were trading, as well as opportunities in distressed debt generally. Excluding investments in China, Beal's companies invested several billion dollars at the recommendation of the Beal Capital Markets group since 2001.

8. Montgomery had been involved in, or had knowledge of, some of Beal's and the Bank's investments in distressed assets, especially non-performing loans. Some of these included: (a) domestic investments in a pool of over 100,000 loans sold by the FDIC with a face value of approximately $20 million, purchased for about $1.4 million or roughly seven cents on the dollar; (b) numerous investments in airline bonds following September 11, 2001, totaling several hundred million dollars; (c) investments in distressed hotel and casino bonds; and (d) investments in power company bonds of more than $1 billion following the Enron and Dynegy frauds and the California rolling blackouts.

9. Like Beal, Montgomery worked on deals that would be researched quickly before an offer was made, sometimes in a matter of days or hours. Montgomery stated that his and Beal's investment philosophy is "to go where nobody else is going and do it quickly" to beat other investors looking for high profit potential "market misconnects."

10. When Beal Capital Markets, Inc. hired Montgomery, Beal defined the pursuit of investments in foreign-based non-performing loans as one of Montgomery's primary business duties. He increasingly sought such foreign opportunities as Beal's and the Bank's potential for "upside returns" on traditional investment targets became more limited within the United States. Beal and Montgomery turned to investing in the "inefficiencies" of foreign markets that allowed greater leverage. Inefficient markets are generally those that have yet to be fully understood by investors at large, leaving opportunities for pioneer investors willing to take some risk of not having complete knowledge of all the pitfalls of that market.

11. Montgomery was involved with and aware of Beal's and the Bank's investments (or attempted investments) in foreign-based non-performing loans and other assets, including a $23 million acquisition of approximately 25,000 non-performing loans with a face value of $460 million originated in Jamaica in early 2002, as well as investments in Estonia, Mexico, Slovakia, Nicaragua, and several other countries.

12. In the Jamaica transaction, Beal and Montgomery relied on the due diligence of their loan servicer. For unsecured loans in the Jamaica transaction, there was little review; what review was done was based on a small statistical sample "just to make sure that [the loans] were ... valid, legally enforceable." Beal Bank ultimately doubled its investment in the Jamaican transaction. Although the Jamaican transaction was not structured for tax benefits, Montgomery realized toward the end of the transaction that, if it had been structured differently, there may have been tax benefits available.

13. In September 2003, Montgomery left Beal's employment and rejoined his accounting firm, known as Montgomery Coscia Greilich LLP ("MCG"), where he currently is the managing partner. MCG provides accounting services and prepares tax returns for Beal and the companies he owns, including BFC and Beal Bank.

## C. The Emergence of the Non–Performing Loan Market in China

14. The non-performing loan business has its roots in the United States Government's response to the savings and loan crisis in the 1980s–1990s. During the crisis, the United States Government established the Resolution Trust Corporation ("RTC"), a government-owned asset management company whose mandate was to liquidate the savings and loans' non-performing loans and other distressed assets. As the RTC sold off its inventory of non-performing loans, best practices were established with respect to sales processes, and specialist non-performing loan investors emerged.

15. Other countries drew upon the United States' RTC model to handle their financial institutions' distressed assets, and non-performing loan markets emerged worldwide. By the time non-performing loan markets developed in Asia in the wake of the late–1990s financial crisis, non-performing loan investing operated under a set of generally recognized guidelines.

16. The non-performing loan market started to develop in China in or around 1999–2000. At that time, China was looking to join the World Trade Organization ("WTO"). To do so, the Chinese govern-

ment sought to reform its State-owned commercial banks ("SOCBs") and turn them into more modern institutions. Responding to concerns about the continued solvency of its banks, and to prevent financial crises, the Chinese government took several steps to reform its ailing banking system, including (1) reduced government interference in bank operations, (2) recapitalized State banks, and (3) created and transferred NPLs to government-owned Asset Management Companies ("AMCs").

17. As of 1999, there were four main SOCBs in China: (1) The Industrial and Commercial Bank of China ("ICBC"), (2) The Agricultural Bank of China ("ABC"), (3) The Bank of China ("BOC"), and (4) the China Construction Bank ("CCB") (collectively, the "Big Four Banks"), which each had specific roles in Chinese lending. These banks were under administrative control by the People's Bank of China ("PBOC"), which is the central bank of the People's Republic of China and has power to control monetary policy and regulate financial institutions, and the Chinese government. The PBOC regulated supply and allocation of credit through an annual "credit plan."

18. Years of inefficient banking policies and procedures, lack of competition due to a state-owned economy, and poor lending decisions to poorly run state-owned enterprises caused the Big Four Banks to generate large numbers of non-performing loans. The Big Four Banks made loans to a variety of Chinese entities, and many of the loans were made without reasonable expectation of repayment to achieve other government purposes without following basic lending principles as practiced in many industrialized economies.

19. In 1999, the Chinese government set up four Asset Management Companies to take on and resolve debt from each of the Big Four Banks. The AMCs were China Great Wall ("Great Wall"), China

Orient, China Cinda ("Cinda"), and China Huarong ("Huarong"). Each of the AMCs was established to resolve one of the Big Four Bank's non-performing loans: BOC/China Orient; CCB/Cinda; ICBC/Huarong, and; ABC/Great Wall. Neither the Chinese government nor the AMCs are subject to taxation in the United States with respect to the non-performing loans.

20. The basic statutory instrument governing the establishment and operation of AMCs was the Regulation on Financial Asset Management Companies promulgated by the State Council in November 2000. The Ministry of Finance, often in conjunction with other Chinese government agencies (such as PBOC, China Banking Regulatory Commission, and State Administration of Foreign Exchange), made numerous regulations, rules and decrees that regulate various aspects of the AMCs operations. The dispositions of NPLs by the AMCs were and are effectively controlled by the Chinese government, as the Ministry of Finance is statutorily empowered to "set the operating targets" for AMCs' disposition of NPLs and to "assess and supervise" their operations.

21. By establishing the AMCs, the Chinese government essentially bifurcated the Chinese banking system into "good banks" and "bad banks." The latter—the AMCs—would receive, manage and maintain the SOCBs' non-performing loans, acting somewhat akin to the United States' RTC model. This allowed the SOCBs—the "good banks"—to clear thousands of distressed assets from their books. With their improved balance sheets and increased liquidity, the SOCBs could use their resources to expand, to "commence a new lending policy based on a client's creditworthiness," and eventually to compete with foreign banks. A parallel goal of the

AMCs was to stabilize and rehabilitate China's debt-ridden State–Owned Enterprises ("SOEs") through an extensive program of government-mandated debt-equity swaps with state-owned enterprises.

22. In 2000 and 2001, approximately 1.4 trillion Chinese yuan (renminbi or "RMB" is the official name for the currency in China; yuan is the principal unit of that currency) (U.S. $169 billion) of the Big Four Banks' non-performing loans were transferred to the four AMCs. Primarily, non-performing loans generated pre–1995 were transferred. Pursuant to Article 12 of the Chinese Regulations on Financial Asset Management Companies, the AMCs purchased the non-performing loans from the Big Four Banks at face value (i.e., outstanding principal plus accrued but unpaid interest).

23. The AMCs were bestowed with unique legal and policy-based "super powers" that were intended to facilitate the AMCs' resolution of non-performing loans. The powers included the ability to restructure debt, pursue litigation against debtors, and toll the statute of limitations.

24. The most important power was that the AMCs were permitted to compromise debt. Historically, the SOCBs were not allowed, except in rare circumstances, to accept anything less than full repayment of loans from borrowers. Consequently, there was no incentive for debtors—even those who may have had the ability to pay off part of their debts—to do anything other than stonewall their lending bank. With the establishment of the AMCs, for the first time a lender was allowed to conduct debt restructuring—it could agree to accept a reduced amount rather than force a debtor into an all-or-nothing choice—thus increasing the likelihood of collecting at least some portion of the amount owed. This change brought renewed value to China's non-performing loans and created significant investment possibilities for those who acquired an interest in such loans.

25. Other AMC "super powers" included the following: the AMCs could provide notice by publication, rather than have to provide personal notice, to a debtor of the transfer of its debt; the AMCs could suspend the statue of limitations on enforcement through publication notice; and the AMCs could waive the need to re-register a mortgage upon transfer or modification of a mortgage contract.

## D. Cinda

26. The Chinese NPLs used in the Southgate transaction were from China Cinda Asset Management Company, a state-owned financial institution supervised by various arms of the Chinese government.

27. Cinda was the first Chinese AMC to be established, on April 20, 1999. It was, and is, a state-owned institution, but maintains an independent legal identity and different supervision than CCB. Cinda and the other three AMCs are all Chinese state-owned companies. Each AMC has registered capital that was allocated by the Chinese Ministry of Finance. The AMCs' business operation and management are conducted by its president and vice-presidents, all appointed by the Chinese State Council (the executive branch of China's central government). There is no independent board of directors for the AMCs.

28. In the relevant time frame, China Construction Bank dealt primarily with Cinda. CCB's personnel were divided between Cinda and CCB, with loan collection personnel going to Cinda and loan origination personnel staying with CCB. Cinda's and CCB's headquarters and branch offices were separate, and Cinda established and maintained offices in most of the regions where CCB originated its non-performing loans.

29. The Articles of Incorporation of Cinda state that Cinda shall be subject to the supervision and management by the People's Bank of China, the Ministry of Finance, and the China Securities Regulatory Commission. The Articles of Incorporation of Cinda were examined and approved by the PBOC on May 24, 2001, pursuant to and in accordance with the provision of the Company Law of China and the Rules on Financial Asset Management Companies and other relevant law and regulations.

30. In 2001 and 2002, CCB was regulated by the PBOC, Ministry of Finance, the Chinese Insurance Regulatory Commission, and the China Securities Regulatory Commission. In 2001 and 2002, Cinda was regulated by the PBOC, the Ministry of Finance, State Economic and Trade Commission, and the China Securities Regulatory Commission.

31. Cinda, as later with the other AMCs, was required by Chinese law to purchase CCB's non-performing loans for their full face value, including accrued but unpaid interest. Cinda acquired those non-performing loans, including the loans ultimately contributed to Southgate, by paying CCB cash, bonds or other negotiated instruments for the face amount of each debt instrument plus accrued, but unpaid, interest. By the end of 2000, Cinda had acquired approximately RMB 373 billion (USD $45 billion) of non-performing loans from CCB. The Ministry of Finance and/or the PBOC, both of which are government agencies, at least implicitly guaranteed the bonds that Cinda issued to acquire the NPLs from CCB. The exchange rate in 2002 was approximately 8.3 RMB to 1 USD.

32. At the time of its transactions with Southgate in August 2002, Cinda was a corporation duly organized and validly existing under the laws of the People's Republic of China.

33. As with the other AMCs, Cinda's trade or business from its inception through the time of the Southgate transaction in 2002 was to receive, manage, and resolve the nonperforming loans of CCB and the other SOCBs, thus allowing the SOCBs to clear thousands of distressed assets from their books, improve their balance sheets, and increase their lending based on creditworthiness. Cinda also engaged in thousands of government mandated debt-for-equity swaps, taking on bad debt in exchange for equity in state-owned enterprises, that were aimed at stabilizing China's many SOEs. For comparison, U.S. entities like Amtrak, the Federal Deposit Insurance Corporation, and the Tennessee Valley Authority are domestic state-owned enterprises. Also, AIG and General Motors arguably are government-owned entities as of the date of this opinion.

34. During 1999 and 2000, Cinda signed debt-to-equity swap contracts with 168 Chinese SOEs involving NPLs with RMB 154.5 billion face amount. In 2001, Cinda signed debt-to-equity swap contracts with sixteen SOEs involving NPLs with a RMB 12.7 billion face amount.

35. In 2000, Cinda disposed of NPLs with RMB 38 billion face amount. These dispositions involved approximately 3,748 NPLs and were in addition to Cinda's debt-to-equity swaps and auctions during 2000. The 2000 dispositions consisted of reductions in loan balances from Cinda's collection efforts. In 2001, Cinda disposed of NPLs with RMB 29.9 billion face amount. These dispositions involved approximately 3,192 NPLs and were in addition to Cinda's debt-to-equity swaps and auctions during 2001. The 2001 dispositions included collections and transfers to joint ventures.

36. In May 2001, Cinda formed a joint venture with Deutsche Bank, the world's second-largest commercial bank and Ger-

many's largest bank, for the purpose of managing and liquidating part of Cinda's NPL portfolio. Deutsche Bank acted as a middleman and sourcing agent of Cinda's non-performing assets.

37. In selling or otherwise disposing of Chinese NPLs, Cinda has carried out investment banking activities. To this end, Cinda became a member of the Shanghai Stock Exchange and Shenzhen Stock Exchange. Cinda also acted as a sponsor or underwriter for stock listings by a number of enterprises as part of Cinda's NPL dispositions through debt-for-equity swaps and asset restructuring. The Government has failed to establish that these actions occurred during the relevant period of 1999–2001.

38. Because the People's Republic of China wholly owned and controlled both the state-owned banks and the AMCs, there was little economic consequences as a result of these transactions because the PRC government effectively shifted non-performing loans from one state-owned entity to another state-owned entity. Cinda thus acquired NPLs with built-in losses for a price that it may not have paid in an arms-length negotiated deal for the NPLs.

39. Cinda disposed of at least 13 percent of its existing balance of NPLs in each year from 1999 to 2001. When properly excluding non-sales transactions, the Court finds Cinda had not "sold, transferred, or exchanged" more than 5 percent of the total basis of all loans it had acquired each year.

40. Southgate's attorneys recognized that the IRS might try to label Cinda's debt-to-equity swaps "sales" for purposes of the mark-to-market ("MTM") rules in Section 475. This does not indicate, however, that Southgate's attorneys considered Cinda a dealer at the time; rather, it indicates an early awareness of potential Government arguments in this case.

### E. Development of China's Non–Performing Loan Market

41. Generally, the environment in China between 2000 to 2002 was strongly pro-business and pro-foreign investment as the country sought entry into the WTO. In that time period, the Chinese government actively sought Western technology, ideas, and capital in an effort to become a greater force in the global economy. Concomitantly, many Western companies developed presences in and/or a strategic approach to business dealings in China.

42. After finding success elsewhere in Asia, foreign non-performing loan investors saw great possibility in the China market; the belief was that the non-performing loan market in China was potentially larger than in any other country in Asia. Reports of early profits earned by foreign investors stoked this enthusiasm.

43. Huarong's November 2001 auction of a non-performing loan portfolio was the first non-performing loan auction in China run under internationally-recognized guidelines. Sixteen bidders, including experienced foreign investors such as Goldman Sachs, Morgan Stanley, Merrill Lynch, and Lehman Brothers, registered for the auction. Huarong sold seven non-performing loan portfolios to two investor groups: Goldman Sachs acquired two portfolios with a face value of $241 million, and a consortium led by Morgan Stanley acquired five portfolios with an aggregate face value of $1.3 billion. It is unclear from the evidence at trial what the bidders paid for the portfolios, although Southgate's expert, Ted Osborn ("Osborn"), estimated they sold for about ten cents on the dollar.

44. Huarong announced these transactions publicly in December 2001 (the "Huarong I" transactions). Almost immediately thereafter, the strong market buzz was that the deals were making tremen-

dous returns. Goldman Sachs was reported to have found a proverbial "nugget"—a real property within the portfolio that was undervalued when Goldman acquired it and then sold for its true market value, which was many multiples of its acquisition price. Collections were reportedly so strong on the Morgan Stanley portfolio that Morgan Stanley never had to reach into its own pocket to pay the full acquisition price. Notably, Huarong—like Cinda, an AMC—served as interim servicer for the Morgan Stanley portfolios during this period of reported early success.

45. The reported success of the Huarong I investors had a powerful impact on the Chinese non-performing loan market. Foreign investors seeking to emulate Morgan Stanley and Goldman Sachs regularly incorporated particular elements of the Huarong I transactions into later non-performing loan deals—including transferring loans to an offshore entity and including the selling AMC either as a joint venture partner or in the post-transaction servicing or collection process.

46. Huarong I was not the only widely-reported transaction in late 2001 that stoked foreign investors' interest in the China non-performing loan market. Also in December 2001, China Orient sold a $217 million portfolio to United States investors. The deal drew a great amount of attention because that NPL transaction was the first involving a foreign investor to close with full government approval, as it was completed around the same time the Huarong I deals were signed but not yet closed.

### F. Southgate Acquires an Interest in Chinese NPLs

47. It was against this backdrop that Montgomery began to investigate potential investment opportunities in the Chinese non-performing loan market. Montgomery was well aware that Goldman Sachs, Morgan Stanley and other foreign entities were investing in China in 2001. China's non-performing loan market was far from a known quantity in 2002, however, as less than a handful of non-performing loan deals preceded Southgate's.

48. Montgomery identified the Chinese non-performing loan market as a potential investment opportunity in February or March 2002. Through extensive research and conversations with several contacts at investment banks, Montgomery ascertained that, although it was in its nascent stages in 2002, the Chinese non-performing loan market was one of the largest in Asia.

49. In contrast to earlier investments on which he worked with Beal, Montgomery sought to determine if a distressed-debt transaction could be structured to provide tax benefits. Montgomery believed the earlier transactions, such as the one in Jamaica, were "missing something" in regard to their potential tax benefits.

50. Deutsche Bank introduced Montgomery to the law firm of De Castro, West, Chodorow, Glickfeld & Nass, Inc. ("De Castro"), which suggested a structure using a network of U.S. limited liability companies. After Deutsche Bank introduced Montgomery to the De Castro firm, Montgomery and Beal sought and received tax advice, including several memoranda, on how to structure such a transaction. In addition to providing tax advice, De Castro attorneys drafted tax opinion letters for Montgomery and Beal, drafted most of the transaction agreements, and helped negotiate and structure the Southgate transaction on Montgomery's and Beal's behalf.

51. Beal first spoke with De Castro attorneys in July 2002. On July 18, 2002, Beal and Montgomery had a telephone conference call with the De Castro attorneys. During that conference call, Beal, Montgomery, and the attorneys discussed

Montgomery's investigation in China to date, the pricing of Chinese NPLs, the proposed transaction structure, and as shown below, the tax implications of the proposed Chinese NPL investment. On the call, they discussed the size of a potential investment in Chinese NPLs held by Cinda—whether Beal would acquire Chinese NPLs with a face amount (including accrued interest) of $1 billion or $500 million.

52. De Castro attorneys prepared several memoranda on the tax implications of the Southgate transaction, covering topics including (1) how the transaction would be reported on Beal's returns; (2) the partnership's preference of foreign rather than U.S. domestic debt; (3) the size and timing of tax losses; and (4) building Beal's outside basis in Southgate. The memoranda reflect Beal and Montgomery's caution in light of the extremely high likelihood of an IRS audit.

53. The Government notes that this discussion of the relative "value" of a foreign versus domestic investment did not mention any non-tax economic profitability considerations. The Court does not find this fact surprising because the De Castro attorneys were hired as tax advisors, and Montgomery and Beal were businessmen capable of evaluating the economic potential of the Southgate deal.

54. One memorandum to Montgomery reveals that a reason for choosing foreign (such as Chinese) debt instead of domestic debt was the greater likelihood of finding "tax value" at a lower price from a foreign source because holders of U.S. debt would generally desire to take the benefit for themselves or extract a higher price for this "tax value." The memo also stated:

> You expressed a concern that an active search for U.S. debt with favorable tax characteristics could expose the strategy to numerous people with potential contact with tax authorities. Also, holders

of U.S. debt will have their own U.S. tax reporting obligation and could take inconsistent positions (despite representations that may be made). This also could provide a trail to you.

> Foreign debt is preferable because it would preserve a lower profile on these matters.

55. Despite the tenor of this tax-specific memorandum, Montgomery and Beal evaluated the contemplated transaction both for its non-tax economic profitability potential and the domestic tax benefits that could result.

56. Montgomery made several trips to China during the summer of 2002 to investigate Chinese non-performing loan investment opportunities.

57. Montgomery's interest in pursuing investments in China dated back to his employment at the Arthur Andersen accounting firm in the 1980s, during which time he participated in a task force concerning Chinese markets. Montgomery cited a number of specific reasons for believing that China presented significant investment opportunities in 2002, including: China was seeking to join the WTO and thus was receptive to foreign investment; China's currency was undervalued, giving investors an opportunity to earn a profit on the anticipated rise in China's currency; and the improved performance of once-struggling companies swept up in the "rising tide" of the rapidly growing Chinese economy would significantly impact the potential value of non-performing loan portfolios.

58. The testimony of Osborn confirmed that Montgomery's optimism about the Chinese economy in 2002 and about the Chinese nonperforming loan market in particular was widely shared by investors at the major brokerage houses and other investors worldwide. Osborn, a partner with the Hong Kong/China firm of Price-

WaterhouseCoopers ("PwC"), is the leading authority on the China non-performing loan market. The Government's expert, Professor Theodore Barnhill ("Barnhill"), met with Osborn twice in connection with his work on this case to learn more about the Chinese non-performing loan market. Osborn leads PwC's Business Recovery Services division, which specializes in advising on debt restructurings, insolvencies, distressed M & A and China non-performing loans. He worked on nearly a dozen non-performing loan-related transactions in the 2001 to 2002 time frame—and more than three dozen overall in the past eight years—on behalf of both foreign investors looking to purchase non-performing loan portfolios in China as well as AMCs seeking to resolve them. Starting in 2000, Osborn met with Chinese AMCs to educate them on best practices for them to use in their non-performing loan resolutions. Through 2007, Osborn was the primary author of Industry Watch and NPL Asia—the premier publications on the Asian non-performing loan market; Osborn's particular focus for these publications was China's non-performing loan market.

### G. The Bank Rejects the Chinese NPL Investment

59. In the spring of 2002, Montgomery consulted with Beal regarding an opportunity to invest in Chinese non-performing loans. The Bank paid for Montgomery to travel to China in July 2002 to conduct preliminary research on opportunities that he had identified there. Initially, Montgomery was trying to identify *secured* Chinese non-performing loans trading somewhere between 10–20 percent of face value. Yet based on his initial due diligence on the Chinese legal system, which raised concerns over the ability to perfect and enforce security interests, Montgomery changed investment strategies. He began to research *unsecured* investments in highly distressed Chinese non-performing loans at a less expensive price, which was below 5 percent of face value.

60. Montgomery presented the general results of his initial due diligence to Beal. Montgomery did not propose any formal investment opportunity to Beal; he only recommended that they pursue lower-quality non-performing loans that were trading at 5 percent or below of face value instead of those trading at 10 to 20 percent of face value as was initially contemplated. Due to the Bank's recent acquisition of a Jamaican loan portfolio and the expectation that regulators would not allow the Bank to leverage its acquisition of an interest in these Chinese non-performing loans, Beal informed Montgomery that the Bank would not do this deal.

61. Because Montgomery believed in the potential of the Chinese non-performing loan market, he sought to be released from his obligations to the Bank so he could pursue the opportunity independently. Beal agreed to release Montgomery, with the understanding that Montgomery would keep Beal reasonably informed of further activities in the Chinese non-performing loan market.

62. Hearing how strongly Montgomery believed in the profit potential of the investment opportunity after his trip to China, Beal in July 2002 advised Montgomery that Beal personally might be interested in making the investment outside of the Bank, but that he did not want to commit time or money to the prospect until Montgomery had secured a specific deal that Beal could consider.

63. Montgomery hoped, but could not be certain, that Beal would invest in the Chinese non-performing loans if Montgomery was able to put a deal together. In the event Beal declined to invest, Montgomery was confident he could find another investor who would invest.

64. Montgomery formed Montgomery Capital Advisers, LLC ("MCA"), a Delaware limited liability company, on or about July 18, 2002 for the purpose of pursuing an investment in the Chinese non-performing loan market. Montgomery was and is the sole member and manager of MCA. Beth Montgomery is not included as a member of MCA on any of the formation documents, but is shown as a member on MCA's federal income tax returns. At this time, Beth Montgomery was an employee and advisor of Beal Capital Markets.

65. As is routine among experienced investors, Montgomery set up a limited liability company through which to pursue this investment to shield himself from personal liability.

66. Cinda had formed China's first joint venture designed specifically to manage delinquent assets with Deutsche Bank in May 2001. Montgomery used his contacts at Deutsche Bank, which acted as the exclusive sourcing agent for Cinda's non-performing loans, to arrange introductions to Cinda.

67. Montgomery met with Cinda for the first time in July 2002. Ma Wen, an executive director of Cinda, was Montgomery's primary contact.

68. Beal's typical investment practice in non-performing loans involves a rigorous due diligence process before entering a transaction. Beal Bank Executive Policies and Procedures ("BBEPP") is a policy manual for Beal Bank. The BBEPP includes a section listing various factors that Beal Bank considers to evaluate a potential investment in either a domestic or foreign loan portfolio. The BBEPP also sets forth guidelines for retaining appraisers to value collateral.

69. In pursuing this investment, Montgomery did not follow Beal Bank's policies for evaluating loan portfolios, primarily because the loans in which he sought to invest were largely unsecured. Beal Bank's policies do not apply to unsecured nonperforming loans.

70. Beal has purchased secured and unsecured assets based on limited research, even in as little as two days, if "the price was right."

## H. Identification of a NPL Portfolio for Investment Purposes

71. In July 2002, Montgomery spent a significant amount of time and money performing due diligence on loans held by Cinda. Montgomery went to China to meet with Cinda and explore potential NPL portfolios.

72. As a part of his due diligence, Montgomery identified a portfolio of approximately 24,000 "Category 4"—severely distressed and uncollateralized—loans held by Cinda, but that Cinda had not previously worked (the "NPLs").

73. The NPLs had a face amount, including accrued but unpaid "balance sheet" interest at the time of Cinda's purchase of the NPLs, of RMB 9,473,111,857, which was equivalent at the time to USD $1,145,479,064.

74. By e-mail message dated July 15, 2002, a De Castro attorney advised Montgomery that the pricing of the Chinese NPLs held by Cinda, including a fee to Deutsche Bank for arranging the transaction, "is the best pricing we have ever seen" and that "[r]egardless of possible tax benefits, due diligence should show possibility of a profit on the investment (including fees)."

75. Montgomery acquired a diskette listing the NPLs in an effort to "tie down" the portfolio. At closing, Montgomery asked Deutsche Bank to confirm that the NPL portfolio Cinda contributed to the partnership was the same portfolio he has previously reviewed.

76. Consistent with his and Beal's experience with severely distressed nonperforming unsecured loans in the United States, Montgomery believed the NPLs would be worth at least 1–3 percent of their face value, with the bulk of profits being generated by finding "golden nuggets" in the pool.

77. Montgomery met with Ma Wen approximately six to ten times in Beijing to discuss a potential transaction relating to the portfolio.

78. In Montgomery's initial discussions with Cinda concerning a potential acquisition of an interest in the NPLs, Cinda proposed an acquisition price equal to 3–3.5 percent of the face value of the portfolio. Montgomery ultimately negotiated the price down to 1.7 percent of face value. After these negotiations with Cinda and due diligence, Cinda agreed to contribute the NPLs to Southgate.

## I. Eastgate's Formation

79. Eastgate was formed as a Delaware LLC on July 31, 2002. Cinda was the sole member of Eastgate upon its formation.

80. Eastgate was formed primarily to act as Cinda's United States investment vehicle for the NPLs. Eastgate was a 100 percent-owned subsidiary of Cinda. Southgate believed this domestic LLC structure was preferable because it was organized under and thus controlled by U.S. and Delaware law.

81. Cinda contributed the NPLs to Eastgate on August 1, 2002.

82. On August 1, 2002, a Contribution Agreement was entered into by Eastgate, MCA, and Southgate (the "Contribution Agreement"), in which Eastgate represented it had not: (1) written any debt instrument comprising the NPLs down or off; (2) made provision for bad debts with respect to the NPLs for tax or financial accounting purposes; or (3) made a determination that all, or any specific one, of the NPLs was worthless or partially worthless.

83. The outstanding balance of the loans, including accrued interest, that Cinda contributed to Eastgate on or about August 1, 2002, when converted was approximately $1,145,479,064.

84. Cinda's tax basis in the NPLs immediately prior to their contribution to Eastgate was equal to Cinda's purchase price of $1,144,801,161 plus accrued but unpaid interest of $234,979,225 for a total of $1,379,780,386.

85. Upon Cinda's contribution of the NPLs to Eastgate, Eastgate's tax basis in the NPLs was equal to Cinda's tax basis in the NPLs.

## J. Southgate's Formation

86. Southgate was formed as a Delaware limited liability company on or about July 31, 2002. Upon its formation, Southgate's members were Eastgate (99 percent) and MCA (1 percent). MCA was the manager of Southgate.

87. Pursuant to the Contribution Agreement, Eastgate contributed the NPLs to Southgate in exchange for a 99 percent membership interest in Southgate; and was credited with an initial capital account balance of $19,420,000. The NPLs transferred by Eastgate to Southgate, at or about the time of Southgate's formation, comprised approximately 19,000 obligors and approximately 24,000 loans.

88. Southgate's initial tax basis in the NPLs was equal to Eastgate's tax basis in the NPLs immediately prior to their contribution to Southgate.

89. MCA transferred $100,000 in cash and a promissory note for the principal amount of $96,162 to Southgate in exchange for its 1 percent membership interest.

90. On August 1, 2002, MCA appointed Deutsche Bank as its exclusive agent for the Cinda NPLs and agreed to pay an initial placement fee of $50,000; in addition, MCA agreed to pay Deutsche Bank additional transaction fees based on the face amounts of the NPLs purchased, which amounted to $8,500,000. Montgomery anticipated that Beal or another investor would cover this fee.

91. The Deutsche Bank fee was a cost of doing business in China. Montgomery had been rebuffed in efforts to go directly through Cinda. Deutsche Bank acted as an intermediary for Cinda and had obtained exclusive brokerage rights. This meant MCA had to pay the 1.7 percent price plus the Deutsche Bank fee of $50,000, the other transaction fees of $8.5 million, and any future fees to obtain the NPLs.

92. The Southgate Operating Agreement was entered into by MCA and Eastgate on August 1, 2002. Under the Southgate Operating Agreement, MCA was paid $1,000 per month and was entitled to 10 percent of Southgate's net profits at such time, if ever, that the members recovered their initial capital contributions plus a 6 percent interest factor. No built-in losses from the NPLs were allocated to either MCA or Montgomery.

93. Under the Southgate Operating Agreement, the members of Southgate could not withdraw from the company within the first three years following admission.

### K. Southgate Partners with Cinda

94. After its formation and funding on August 1, 2002, Southgate, as owner of the NPLs, entered into a three-year loan servicing agreement with Cinda (the "LSA") to service the NPLs. Under the Cinda–Southgate LSA, Cinda was to service the NPLs and was entitled to a fee equal to 25 percent of net collections after expenses.

95. Montgomery learned that Cinda had to pay 99 percent of any proceeds from the acquisition price of the NPLs to service the bonds used to finance its acquisition of those loans from CCB, whereas Cinda was able to keep servicing fees for its ongoing operations. Montgomery thus negotiated a servicing fee of 25 percent of gross collections in exchange for a reduction in the acquisition price of the NPLs from the 3 percent of face value that Cinda originally requested to the 1.7 percent ultimately agreed upon amount to be paid. In doing so, Montgomery incentivized Cinda's collections efforts and provided Cinda with working capital.

96. The LSA provided that Cinda was to service the loan pool "with reasonable care and efforts in accordance with the terms of the [LSA]." Cinda was also to service the assets "in accordance with customary and usual procedures employed by parties engaging in the business of servicing loan contracts and, to the extent more exacting, in accordance with the procedures used by [Cinda] to service and administer similar contracts owned by [Cinda] . . . ." Cinda was also prohibited under the LSA from taking "any action . . . which would diminish or impair . . . [Southgate's] rights under [the LSA] or . . . [Southgate's] rights with respect to the Assets." The LSA did not forfeit Southgate's rights as owner of the loans or Southgate's ability to determine which loans Cinda could service.

97. For a number of reasons, Montgomery believed that Cinda was the best choice to service the NPLs. First, it was a large, organized, and regulated entity "with controls, processes and procedures throughout [China]." Second, Montgomery believed that an effective servicer of the NPLs, which were spread geographically throughout China, must have branches "in all the areas where the loans were."

Cinda, with twenty-eight different branch locations throughout China, satisfied that requirement. Montgomery did not learn until September 2004 that Cinda's headquarters failed to pay its branches for their collection work on the NPLs. Third, Montgomery's understanding was that Cinda was "aggressively" pursuing its own collections of its high-quality non-performing loans, including by filing thousands of lawsuits. Fourth, Montgomery believed that Cinda was incentivized to become an effective servicing agency so that it could continue to work portfolios in the future. Fifth, as with all AMCs, Cinda possessed certain "super powers" with respect to collections, most notably the ability to compromise or restructure debt. Finally, Montgomery believed that the only alternatives to Cinda would have been "very small one- and two-man collection type firms," which would not have been capable of servicing such a large, geographically-diffuse portfolio of loans as Southgate's.

98. Montgomery's approach was consistent with Chinese non-performing loan market practice in 2001–2002, as it was typical for foreign investors to retain the selling AMC post-closing in a loan servicing capacity. Southgate's expert Osborn, who has been involved with servicing pools of Chinese non-performing loans, found Southgate's servicing arrangements with Cinda, including the 25 percent servicing fee, to be reasonable.

99. It was reasonable for Southgate to retain Cinda as servicer, and to believe that Cinda's fee and the fact that Cinda retained a direct interest in the NPLs would incentivize Cinda to pursue collections aggressively.

100. Government witnesses Barnhill and Jiawen Yang ("Yang") opined that Southgate should have foreseen a purported conflict between Cinda's contractual obligations as Southgate's loan servicer and its duty to help reform China's SOEs, as mandated by the Chinese government. The evidence partially contravenes this assertion. At the time of the Southgate transaction, the Chinese government was desperately trying to attract foreign investors to the non-performing loan market. AMCs had sued SOE debtors and had utilized other aggressive collection methods for the benefit of their foreign investor clients. And it was widely reported that Huarong's performance as servicer for the portfolios acquired in Huarong I was strong.

101. Barnhill and Yang contend that Southgate should have been aware of the fact that profits earned by early foreign investors had embarrassed Chinese political officials, who subsequently attempted to stifle returns. These facts illustrating this phenomenon did not largely manifest themselves until after the transaction was completed in 2002—i.e., late 2003 or early 2004—and were not known to Southgate at the time of its transaction. Even if, with the benefit of hindsight, Southgate might have selected a different servicer, that does not necessarily make the selection of Cinda suspect at the time because it could not reasonably have known about the changing political winds in China.

102. Notwithstanding the opinions of Government witnesses, the weight of the evidence shows that from Southgate's perspective in 2002, the LSA with Cinda was a legitimate and reasonable agreement.

## L. Montgomery's Due Diligence Efforts

103. After Southgate was formed on or about August 1, 2002, MCA continued its legal and financial due diligence on the NPLs. MCA engaged Chinese legal counsel, Haiwen & Partners ("Haiwen"), and a Chinese valuation firm, Zhongyu Assets Valuation Co., Ltd. ("Zhongyu"), to conduct legal and asset due diligence with

respect to NPL investment opportunities that MCA had identified.

104. To facilitate the due diligence, all loan files in relation to the NPLs (which were held by Cinda's twenty-eight branches throughout China) were sent to Cinda's headquarters in Beijing. Zhongyu and Haiwen conducted their own due diligence at Cinda's headquarters. Both Montgomery and De Castro attorney Andre Bernknopf ("Bernknopf"), who were in Beijing negotiating with Cinda at the time, observed the amassed loan files during this due diligence process. Zhongyu and Haiwen each examined a small sample of the NPLs destined for the Southgate portfolio.

#### i. Zhongyu Valuation

105. Montgomery engaged Zhongyu, a valuation firm based in China, to provide a valuation analysis of the NPLs.

106. Zhongyu carried out its due diligence over twenty working days, from July 22, 2002, to August 16, 2002, and reported its findings to MCA on August 16, 2002. The valuation report regarding the NPLs was prepared by Zhongyu at the request of Haiwen on Southgate's behalf. For purposes of determining the value of the NPLs, Southgate relied on, among other things, Zhongyu's report.

107. Due to the size of the NPL portfolio and other factors, Zhongyu performed its services based on the top two-hundred loans in terms of face value, plus a statistically valid sample of the portfolio. The total face value accrued interest of the NPLs in the sample was about 35 percent of the total portfolio. Zhongyu's sample reflected the characteristics of the whole portfolio.

108. Given the pennies-on-the-dollar purchase price of the NPLs and their generally poor documentation, site visits and in-depth analysis of the loans would not have been cost effective. The cost and time investment of thoroughly investigat-ing some 19,000 borrowers spread across the country of China would have undermined the profit potential of the deal. Hence, a "sampling" of the portfolio was reasonable.

109. Zhongyu estimated that the value of the NPLs was between 3.90 percent and 9.76 percent of face value, or between $44,673,683 and $111,798,757, based on a sampling of borrowers. The Zhongyu report did not state a valuation standard by which it measured the Chinese NPLs that ultimately went into the Southgate portfolio. The value overestimated Southgate's actual recovery.

110. Given the typical market practice in China in 2001, the Court finds that Southgate reasonably relied on Zhongyu's analysis. Zhongyu's analysis was consistent with Cinda's own 5 percent target recovery rate for "category 4" loans. The Zhongyu valuation, when compared to Southgate's 1.7 percent acquisition price, showed a reasonable possibility of profit.

111. As a part of its valuation analysis, Zhongyu graded certain loans in its sample as "A," "B," or "C" category loans. Category A and B loans were both categories of loans in which Zhongyu identified either "good quality assets" or "relatively good quality assets" available to support collections.

112. Based on his investigation of Zhongyu before he retained the firm, Montgomery reasonably believed that Zhongyu did not have any conflict of interest. Montgomery specifically asked whether Zhongyu had previously done work for Cinda. He was told that Zhongyu had not.

113. As early as October 2002, three months after the Southgate transaction closed, Tony Chen ("Chen"), who worked for MCA, wrote a memorandum stating that the information gathered by Zhongyu

was "not complete and not enough." Chen's memorandum also indicated that the NPLs in the Southgate portfolio were "classified as 'lowest priority loan' before, which generally means there is only little hope to get the loans paid back." Montgomery admitted that Chen's criticisms of the Zhongyu appraisal were accurate.

114. In discovery in this case, it became known that Zhongyu undertook a simultaneous valuation study for Cinda on NPLs drawn apparently from the same pool, contradicting Zhongyu's assertion that it had no conflict of interest. In the Cinda valuation, Zhongyu reached a valuation (1.18 percent and 1.56 percent) that supported Cinda's decision to sell the loans to Southgate for 1.67 percent of the face value. In the Southgate valuation, Zhongyu reached a valuation (3.90 percent to 9.76 percent) which is used to support Southgate's contention that there was an expectation of making a profit on the transaction.

### ii. Haiwen Opinion

115. MCA engaged Haiwen, a Chinese law firm, to conduct legal due diligence on Cinda and the NPLs, i.e., were the loans legally enforceable? Due to the size of the NPL portfolio, among other factors, Haiwen conducted its due diligence on a sampling basis representing all regions and industries of the obligors.

116. Haiwen reviewed 1,900 of the NPLs in preparing its due diligence report. Only one was found to be unenforceable, and less than 1 percent of the loans in the portfolio were to obligors in bankruptcy. Haiwen also reviewed approximately two-hundred of the NPLs with the highest principal amounts, and found documentation to support each one.

117. On or about August 30, 2002, Haiwen issued both a legal opinion and a Due Diligence Report to MCA.

118. Haiwen's legal opinion included the following representations: (1) the transfer of the NPLs by Cinda to Eastgate was valid under the laws in China; (2) the NPLs were legally binding obligations under the laws in China, were genuine indebtedness, and had not been discharged; (3) Cinda was the sole legal and beneficial owner of the NPLs; and (4) Haiwen had not found any evidence that any NPLs had been written off as worthless or written down for financial or tax accounting purposes by Cinda.

119. Haiwen's Due Diligence Report, based on its review of some 1,900 of the NPLs, included the following representations: (1) a People's Republic of China ("PRC") court had declared that one NPL loan contract was invalid; (2) four borrowers were bankrupt and the bankruptcy procedures for these four borrowers were closed and finalized; (3) thirteen borrowers were bankrupt and the bankruptcy proceedings were ongoing; (4) five borrowers were deregistered; (5) sixteen borrowers were in process of being dissolved; (6) there existed a PRC court order indicating that one borrower and the creditor (that is, CCB or Cinda) had reached a settlement; and (7) fifty-one borrowers had their business licenses revoked and they could not legally continue to trade.

### iii. Sinobridge Opinion

120. On or about August 30, 2002, MCA received an additional legal opinion from Sinobridge, a Chinese law firm that represented Cinda in connection with the Southgate negotiations, concerning the transfer of the NPLs to Eastgate and Southgate.

121. Sinobridge's opinion included the following representations: (1) Cinda was a valid corporation and had the power and authority to execute the Contribution Agreement and the Southgate Operating

Agreement in respect of Eastgate, and the LSA; (2) Cinda was required by government directive to acquire the NPLs by paying CCB cash with respect to the face amount and cash, bonds or other negotiable instruments with respect to accrued interest; (3) Cinda was the owner of the NPLs; (4) the transfer of the NPLs by Cinda to Eastgate was valid under Chinese law; and (5) the NPLs were legally binding obligations under Chinese law. The Court finds it was reasonable for Montgomery to rely on the opinions of Haiwen and Sinobridge.

## M. Southgate's Due Diligence was Reasonable

122. The due diligence done by Southgate was consistent with what other investors were doing in the same time period. Montgomery took the pre-transaction steps necessary to put Southgate in a position to succeed. His efforts, and those of the professionals retained by and on behalf of Southgate, evidence Southgate's genuine expectation of making some profit on this transaction.

123. Montgomery testified that he considered the difficulties that could be faced by an investor seeking to enforce judgments in Chinese courts, which led him to target a lower quality—and less expensive—loan portfolio. Despite the practical and legal difficulties in China's system, various witnesses confirmed that these issues did not preclude successful collections efforts on non-performing loans.

124. The professionals retained by Southgate or on Southgate's behalf appropriately evaluated the NPL portfolio. They considered, among other things, whether the NPLs were legally enforceable, what industries and geographical regions were involved, and whether Cinda had previously worked the loans.

125. Southgate's due diligence efforts went beyond what is often done in this type of transaction. When a high net-worth investor invests in a pool of loans for which he is paying pennies on the dollar, due diligence is not necessarily cost-effective. Such an investor normally invests in the loans for a small percentage of their face value in the hopes of finding "nuggets" or "gems"—the relatively small number of recoverable loans—that will make the purchase profitable. In such circumstances, due diligence is often not worth the expense.

126. Southgate's experts, Osborn and accountant Cosimo Borrelli ("Borrelli"), who themselves have conducted due diligence on pools of non-performing loans in China, found Southgate's due diligence, and the work of Zhongyu and Haiwen, reasonable. The Court agrees.

127. Borrelli works in Hong Kong as managing director of an insolvency restructuring firm, akin to a bankruptcy trustee in the United States, and has significant hands-on experience with due-diligence and analysis of non-performing loans generally and the Chinese non-performing loan market specifically. Borrelli has more than twenty years of experience dealing with non-performing loan servicing and due diligence, and since 1999 he has worked extensively in the Chinese and Asian non-performing loan markets. Borrelli has advised investors in and done due diligence on pools of Chinese non-performing loans of a size and quality similar to Southgate's. In addition, Borrelli has repeatedly been appointed by courts in Hong Kong and elsewhere as a trustee, liquidator, and receiver. In that work, Borrelli has had experience with, among other things, resolving legal disputes and claims with mainland Chinese creditors, including AMCs, and implementing a restructuring with the Chinese Ministry of Finance.

128. Zhongyu's sampling methodology and approach to evaluating the NPLs was

both reasonable, appropriate, and "typical of what [one] would expect to see," in light of the size, scope and quality of the portfolio.

129. Likewise, the legal due diligence conducted by Haiwen was reasonable and typical.

130. Barnhill and Yang contend that Southgate failed to conduct adequate due diligence prior to acquiring the NPLs and that Southgate's failure to do further investigation undermined the credibility of, and any hope for a successful return on, its investment. Barnhill and Yang were unaware of either the specific due diligence efforts undertaken by any other foreign non-performing loan investor or the typical due diligence practices of Chinese non-performing loan investors at the time of the Southgate transaction. Barnhill and Yang's testimony regarding Southgate's due diligence therefore does not change the Court's analysis.

131. Barnhill and Yang argued that Zhongyu relied on information from Cinda's loan files that could have been biased or incomplete. Because Barnhill and Yang do not actually know what was in the files that Zhongyu reviewed, they have no information that the sample of loans studied by Zhongyu was biased. Moreover, the information in Cinda's loan files was typical of what was seen in AMC loan files in 2002, and Barnhill and Yang have no evidence to the contrary.

132. Barnhill and Yang also testified that Zhongyu's valuation did not account for the efficiency of the Chinese legal system, a factor that could affect Southgate's return on its investment. Barnhill and Yang did not know whether or not Zhongyu factored the efficiency of the Chinese legal system into its analysis because there was no specific analysis or line item in Zhongyu's valuation to reflect it.

133. Barnhill offered an "alternative" valuation in the form of a completely theoretical model. This hypothetical model has little probative value about the real Southgate transaction. Barnhill concedes that his model is not any kind of industry standard, and cannot point to a single instance where his theoretical model has been used to value a non-performing loan portfolio, in China or elsewhere. The model cannot be used to determine the value of the NPLs, because it requires gathering multiple data points and applying the model to each individual loan in the portfolio.

134. Barnhill and Yang also assert that Southgate failed to look into Zhongyu's potential conflicts of interest and was therefore unaware that Zhongyu had allegedly performed valuation services for Cinda regarding the NPLs. Southgate did at least inquire about Zhongyu's potential conflicts of interest, asking both Haiwen and Zhongyu. Barnhill and Yang presented no specific references or information to support their assertion that more extensive due diligence was typical market practice in 2001 and 2002.

135. Barnhill and Yang's contention that Southgate's pre-transaction due diligence was inadequate because the process was completed in less than two months does not change the Court's opinion, as they conceded that they are not aware of how long it took any other foreign investor to conduct their due diligence. Montgomery noted that in the Southgate transaction there was at least forty-five days of due diligence prior to the closing of the transaction, compared to many of his other deals where due diligence is conducted for "a week or less." He noted that in Beal Bank's earlier purchase of Jamaican NPLs, the bank sent one executive to Jamaica for approximately a week to conduct due diligence.

136. Barnhill and Yang's opinion that Southgate's failure to conduct site visits,

real estate appraisals or other in-depth analyses on information beyond what was reflected in Cinda's files is largely irrelevant. Engaging in an in-depth analysis of the loans, accompanied by site visits and the like, would have been of limited value in connection with the Southgate portfolio. The paucity of underlying information is typically built into the value paid for a portfolio. Given the portfolio's characteristics—roughly 19,000 borrowers spread across China, and mostly uncollateralized loans of relatively small size and low credit quality—such efforts would not have been cost effective. Furthermore, site visits normally are undertaken only on significant pieces of property held as collateral, and the Southgate portfolio was not heavily collateralized.

137. As of 2002 in China, non-performing loan investors typically could not make contact with, or obtain information from, borrowers directly. Rather, as was the case with Southgate, the information reviewed for due diligence purposes is restricted to that in the AMC's files.

## N. Beal Invests in Southgate

138. Following his due diligence into the NPLs, and in keeping with Montgomery's agreement with Beal, Montgomery provided Beal with a memorandum on August 25, 2002, detailing Southgate and the NPL investment opportunity. The memo outlined the changing financial landscape in Asia, explained Cinda's portfolio, and declared that "[i]n addition to the economic upside on the portfolio, we have been able to structure this transaction more advantageously taxwise than the Jamaica investment." Beal agreed that Southgate posed significant profit potential.

139. Beal subsequently agreed to acquire a majority interest in Southgate. On or about August 27, 2002, Beal set up Martel Associates, LLC ("Martel"), a Delaware limited liability company wholly owned by Beal, as a special purpose entity through which he would acquire an interest in Southgate. Upon its formation, Martel's sole member was Beal. De Castro attorneys and legal assistants handled the formation of Martel for Beal.

140. On August 30, 2002, Martel purchased 90 percent of Eastgate's 99 percent membership interest in Southgate for $19,407,000, and Martel was admitted as an 89.1 percent member of Southgate. Eastgate owned a 9.9 percent interest, and MCA owned a 1 percent interest in Southgate.

141. Until this point, there was no certainty that Beal would invest in Southgate. Beal, "still steaming about the Deutsche Bank fee," walked out of the August 30 closing and only agreed to proceed with the transaction after he received additional assurances from Haiwen. Martel paid $19,214,000 via wire transfer from Beal's Goldman Sachs account and gave Eastgate a $193,000 promissory note rather than cash. The promissory note represented one percent of the total purchase price to reflect the fact that approximately one percent of the NPLs in the portfolio did not meet the desired criteria and were intended to be replaced with loans that met the criteria. Beal incurred almost $10 million in transaction costs associated with the Southgate transaction.

142. The Southgate Operating Agreement was amended and other documents were executed to reflect Martel's admission as a member and its holding of a supermajority interest in Southgate. The Southgate Operating Agreement gave MCA a 10 percent interest in Southgate's profits to the extent that its profits exceeded 6 percent annually. Montgomery was not eligible to take any of Southgate's built-in losses. Montgomery would only earn a profit if the Southgate partnership was profitable.

143. On or about September 3, 2002, Martel paid Deutsche Bank's $8.5 million fee, after assuming MCA's rights under its engagement with Deutsche Bank. Martel also authorized Southgate to reimburse MCA for other fees and expenses, not exceeding $625,000, incurred by MCA, and to pay MCA a fee of $200,000 for services rendered, including putting the deal together and introducing Beal to the opportunity.

144. Beal and Montgomery relied, in part, on the Sinobridge and Haiwen legal opinions in connection with Martel's acquisition of an interest in Southgate. In addition, as part of Martel's acquisition of an interest in Southgate, the De Castro law firm provided Cinda with representations regarding the legal status of Southgate as an LLC, the regulatory environment in the U.S. and the formative state of Delaware, the fact that Southgate had no legal or governmental proceedings pending, and that Eastgate would have all rights of a "member" pursuant to the operating agreement.

## O. The Southgate Transactions had a Reasonable Possibility of Profit but Reflected Tax–Driven Considerations

145. As discussed, the Southgate transaction fit within Beal's and Montgomery's core business. They believed that they could earn a profit from the NPLs, and they would have done this deal regardless of whether or not it had any tax benefits.

146. Yet the Southgate transaction structure was different from the structure that Beal Bank had used in previous international NPL portfolio acquisitions. In its acquisition of the Jamaican NPL portfolio in 2002, for example, Beal Bank (through a subsidiary) purchased the NPL portfolio directly from the foreign seller.

147. Under the structure of the Southgate transaction, Montgomery was not entitled to any tax benefits. Rather, Montgomery was looking long term—he hoped to become an expert, and "develop a tremendous amount of knowledge about China and then do multiple transactions going forward."

### i. Cinda's Contribution of the NPLs to Eastgate

148. Transferring the NPLs to Eastgate provided Cinda with a layer of liability protection with respect to the NPLs, its dealings with MCA, and its participation in a joint venture with respect to the NPLs. By partnering in Southgate through Eastgate, Cinda could avoid investing directly in a United States partnership, which by agreement was subject to United States tax law, potentially giving rise to responsibilities and liabilities unknown, unwanted, or not well-understood by Cinda.

149. Montgomery preferred to partner with Eastgate rather than Cinda directly because the former was subject to United States law.

150. The transfer of the NPLs to Eastgate also confirmed that Cinda had the right and ability to contribute the NPLs to a United States entity.

### ii. Formation of Southgate

151. Southgate was formed with the view that Montgomery would pursue an investor in Southgate on behalf of Cinda—if Beal was not interested, Montgomery believed that he would be able to attract another investor based on his developing skill set in Chinese investments. The formation of Southgate was important in several respects.

152. First, the establishment of a non-Chinese entity into which non-performing loans were transferred—a typical feature of transactions conducted between foreign investors and Chinese AMCs in 2001–2002—avoided the difficulties of getting

approval for a wholly-owned foreign entity in China. Structuring a holding company for the NPLs outside of Mainland China also allowed for easier conversion of RMB into United States dollars.

153. Second, Montgomery was able to confirm Cinda's title to the NPLs and its authority to transfer them to a United States-based partnership. Montgomery also received preliminary approval from the State Administration of Foreign Exchange ("SAFE"), the Chinese government agency that controls the flow of currency into and out of China, for the transactions.

154. Third, Montgomery negotiated an acquisition price—a potential investor would pay approximately 1.7 percent of the face value of the portfolio for a 90 percent indirect interest in that portfolio—that afforded an investor an opportunity to turn a profit. Moreover, by negotiating the acquisition price downward and at the same time negotiating Cinda's collection fee upward to 25 percent of gross collections, Montgomery aligned Cinda's interests with Southgate's: the collection fee would help ensure that Cinda had the working capital and motivation to work the NPL pool; Cinda would be able to pay bonuses to those managers that performed well; and the eventual investors' risk in the venture would be lowered as their up-front cash investment would be smaller.

155. Fourth, Montgomery was able to "lock-in" all of the loans that met his investment criteria—"category 4" loans that had not been worked—by making the acquisition of all such loans a condition of the transaction. Securing the portfolio prevented Cinda from "cherry picking" for itself valuable loans discovered during the due diligence process—a common experience with Chinese AMCs.

156. Fifth, the formation of Southgate enabled Cinda to remove from its books thousands of "category 4" non-performing loans, while retaining a profits and servic-

ing fee interest. This deal also helped position Cinda to accomplish one of its primary objectives set forth in the laws creating it and the other AMCs—attracting foreign investors:

> Article 3. Absorption of foreign capital into asset restructuring and disposal shall be conducted with a view of the strategic realignment of the national economy, shall promote the reform of state-owned enterprises and the establishment of modern enterprise systems through revitalization of bad debt by absorbing foreign capital
>
> . . .

Provisional Regulations on Absorption of Foreign Capital in Assets Restructuring and Disposition by the Financial Assets Management Companies (issued jointly by the People's Republic of China Ministry of Foreign Trade and Economic Cooperation, Ministry of Finance and the People's Bank of China) (translation). In late 2001, Cinda completed a technical assistance project with the Asian Development Bank regarding restructuring and disposing of its assets for the purpose of seeing whether its practices for realizing assets and restructuring of loans with the SOEs reflected best international practices.

157. Additionally, Montgomery obtained representations from Cinda that were critical to determining whether, in addition to the investment opportunities, the NPL investment also potentially had significant United States tax benefits. These representations included that Cinda had acquired the NPLs from CCB for cash and securities equal to the unpaid principal and accrued interest on the loans, that Cinda had not written off the NPLs on its books, and that Cinda had not operated as a dealer in securities. Sinobridge and Haiwen confirmed these representations.

### iii. Selection of Cinda as Servicer

158. Montgomery entered into the LSA, which secured Cinda as a servicer for three years, ensuring that he would have a servicing partner for a length of time sufficient to either resolve the portfolio or establish his own collection entity.

159. The LSA allowed Montgomery to achieve the essential benefits of partnering with a Chinese entity, and Cinda in particular, including: 1) the ability to comport with Chinese law, which severely restricts who can collect debt; 2) the ability to service a geographically-diffuse portfolio of loans—Cinda had branches in all fifteen provinces in which the NPL debtors were located, whereas Montgomery had no Chinese presence prior to this transaction; 3) maintaining influence in the Chinese courts; and 4) retaining Cinda's "super powers" relating to collections.

160. Montgomery reasonably chose to partner with Cinda; the non-performing loan industry was fairly new in China and there were few viable alternatives to the AMCs. As a result, Southgate allowed Cinda to dictate some terms of the LSA, thereby establishing the terms on which Southgate could actually realize economic returns from the NPLs in the Southgate portfolio.

161. The LSA explicitly disavows any partnership relationship between Cinda and Southgate arising from that agreement: "Servicer [Cinda] and Owner [Southgate] are not partners, joint venturers, agents or assignees of each other."

162. As a result of the closing of the August 1, 2002, transactions, Southgate provided a potential investor the benefit of built-in management and servicing of the NPLs: through Southgate, Montgomery was able to lock-in a portfolio of loans, line up a servicer for three years, and secure a Chinese partner for purposes of collections. Montgomery accomplished these aims without injecting significant amounts of capital into Southgate. The completion of substantial valuation and legal due diligence and the issuance of the Zhongyu and Haiwen reports shortly after the August 1 closings bolstered Southgate's position as an investment vehicle.

163. The LSA, however, did little to address the significant potential conflicts of interest that Cinda, under Chinese government control, would face in enforcing loan obligations on behalf of a foreign investor against the NPL debtors in the Southgate portfolio that were state-owned enterprises, if not government agencies themselves.

### P. The Purpose of Martel, Beal's Wholly Owned LLC

164. Beal invested in Southgate because it posed profit potential, and it offered potential tax benefits.

165. By purchasing Eastgate's interest in Southgate, Beal, through Martel, could get representations and warranties directly from Cinda. Had Cinda violated those representations and warranties, Martel could have had claims against Cinda directly, whereas if Martel had purchased an interest directly in Southgate, Martel likely could not bring any claims directly against Cinda or Eastgate.

166. Additionally, Martel's purchase of Cinda's interest in Southgate provided Cinda with immediate liquidity. If Beal had simply invested in Southgate, Cinda would have had to rely on Southgate to distribute cash to it. Though unknown to Southgate at the time, the funds from the Southgate transaction would allow Cinda to make an interest payment on the bonds that it issued to acquire the NPLs from CCB.

167. Based on the record at trial, the Court finds that Southgate and its members entered into the NPL investment for

legitimate purposes with a reasonable possibility of making a profit.

## Q. Southgate's Servicing and Collection Efforts

168. After the closing of the transactions on August 30, 2002, Cinda provided notice to all borrowers advising of the transfer of the NPLs to Southgate, thus tolling any applicable statutes of limitations.

169. Starting in late 2002, Montgomery and MCA expended significant effort to develop a plan to maximize collections on the NPLs because Cinda had limited personnel and did not prioritize the Southgate NPL collections. To further its efforts, MCA hired Chen, a Chinese national and former CCB employee, as a full-time employee in October 2002 to focus on Southgate collections. In 2003, MCA added a second full-time employee, Doug Zhuang ("Zhuang")—also a Chinese national—to work with Cinda on Southgate collections.

170. MCA initially developed a two-step approach to resolving the NPLs, with the ultimate aim of identifying the "nuggets" or "gems" in the portfolio that would have the best chance for significant recovery. The first step was to eliminate the smallest NPLs and NPLs in provinces in which Southgate did not have sufficient resources to collect, and to identify 4,000 to 6,000 loans for a more detailed review. Out of this group, it was expected that approximately half would have significant value. The remaining 20,000 to 22,000 NPLs would be packaged into smaller groups and sold to small, local collections firms; value from these loans was later realized through auctions in 2003. This strategy allowed Southgate to focus resources on a small number of profitable "nuggets."

171. Among the "nuggets" Southgate focused on collecting were government agency loans ("GALs") and "Positive Loans." A GAL is a loan backed by a *guarantee* of a Chinese government agency. Positive Loans, which included GALs, were loans that Southgate identified as having significant value, perhaps as much as ten to twelve times their acquisition price.

172. Montgomery anticipated that a large number of the lowest-quality NPLs would be sold quickly in order to obtain operating capital, and so that Southgate could focus on vetting and collecting on the remaining higher-quality NPLs. Consistent with that approach, Cinda proposed a collection plan to Southgate under which approximately 25 percent of the loans would be resolved in 2002, 50 percent in 2003, and 25 percent in 2004.

173. Montgomery understood that a disposition of the NPLs before the end of 2002 was necessary to generate a tax loss that Beal could claim on his personal federal income tax return for 2002.

174. To this end, after Beal acquired his interest in Southgate, Montgomery sought advice to determine how best to trigger the built-in losses from the Southgate portfolio. In a memorandum transmitted to Montgomery and Beal dated November 1, 2002, De Castro attorneys Bernknopf and Menasche Nass ("Nass") advised Beal that "it is much better to trigger the loss through a sale for some cash rather than to write off the debt. A sale for cash is a clean realization event. . . ."

175. Following the advice given by Nass and Bernknopf in their November 1, 2002 memorandum, Montgomery determined that 20 to 25 percent of the Southgate Chinese NPL portfolio was to be sold by the end of 2002. This amount was apparently dictated by Beal's "past practice" in prior years to shelter most, but not all, of his expected income for the tax year.

176. Initially, Beal decided that approximately $200 million of Southgate's NPLs (face amount plus accrued interest) should be sold in 2002. Southgate therefore asked Cinda to sell 20 to 25 percent of the NPLs by year-end 2002. By e-mail message dated November 15, 2002, Chen advised Montgomery that Cinda had agreed to "[s]ell 20% to 25% of our assets in this year." By memorandum dated December 11, 2002, Montgomery confirmed with Beal the "target of disposing of 20% of the principal of the portfolio by 12/31/02."

177. Southgate's collection strategy appears reasonable. As Borrelli testified, the strategy to break down the portfolio into smaller parcels, then auction off the majority of the loans in packages in order to "filter out the gems [is] what any experienced NPL investor would do with a large low quality portfolio." Borrelli has participated in, or executed, similar collection strategies multiple times.

178. Following Cinda's plan, in December 2002, Southgate sold several smaller portfolios of the lowest quality NPLs—all of which were being serviced by regional branches of Cinda—to unrelated third parties. The sales were negotiated with the buyers and then submitted to a public auction process to reduce the risk of fraud and ensure the arms-length nature of those sales.

179. Reflecting the three-year term of the LSA, the sale of a predetermined percentage of the face value of the Southgate portfolio was regular practice for Southgate for subsequent years as well. Southgate determined the amount of NPLs in the portfolio to be sold in 2003, setting a "target" of $450 million in face value.

180. Southgate's strategy had the effect of tailoring annual Chinese NPL sales to the amount of personal income that Beal sought to deduct from his taxes and caused Southgate to generate claimed losses that offset 90 percent of Beal's substantial income from BFC, the parent company of Beal Bank, in the years 2002 through 2004.

181. As of December 31, 2002, NPLs with a face amount plus accrued interest through December 31 of $253,836,399 (an amount, in layman's terms, that Beal could potentially offset against his taxes) and representing 3,092 borrowers were sold for a gross amount of $3,214,952, or 1.3 percent (the "Sold NPLs"). The Sold NPLs represented about 22 percent of the total NPL portfolio. Cinda disposed of these NPLs mainly through package sales of the loans. Most of these NPLs were sold in late November and December 2002, consistent with the amount of tax losses for 2002 that De Castro's tax lawyers had suggested be generated from this transaction. This was also done in accordance with Southgate's plan to dispose of all the NPLs within three years.

182. Although Southgate cannot establish that the sale price of each NPL that was sold by Southgate in 2002 was equal to each Chinese NPL's pro rata share of the sale price of the portfolio that was sold nor confirm whether any of the NPLs sold in 2002 were uncollectible at the time, the facts show the NPLs as a portfolio had some value.

183. Total expenses incurred as a result of collection efforts, including Cinda's servicing fee of $722,000, were $1,052,000.

184. The net recovery was $2,162,952 ($3,214,952 gross proceeds minus $1,052,000 expenses). Thus, Southgate suffered a loss of approximately $294,861,591 ($253,836,399 paid by Cinda for the NPLs sold in 2002 + $43,188,144 of accrued but unpaid interest—$2,162,952 net recovery) on the sales in 2002. Of this amount, $292,849,000 million were "built-in" and $2,011,000 million were post-contribution losses.

185. Despite efforts to prod collections by Cinda, from Southgate's formation in August 2002 through the third quarter of 2003, the overall net collection rate was 1.08 percent of the outstanding principal balance of the NPLs. In the second quarter of 2004, with approximately 70 percent of the Southgate NPL portfolio disposed of, the overall net collection rate was 0.98 percent.

186. Nevertheless, Montgomery and Beal entered into another NPL transaction with Cinda—the "Pinnacle" transaction—in late 2003. It is unclear why they would return to the same unprofitable NPL trough after their difficulty with Cinda's servicing of the Southgate portfolio, other than the anticipated tax benefits.

187. At the time Cinda, through Eastgate, contributed the NPLs to Southgate, the NPLs had a built-in loss of $1,360,360,386—equal to the $1,144,801,161 Cinda paid for the NPLs plus accrued but unpaid interest of $234,979,780,386 on Cinda's books less the $19,420,000 value Cinda and Montgomery negotiated for the NPLs upon their contribution to Southgate. Therefore, a portion of Southgate's loss in 2002 of $294,861,591 constituted Cinda's built-in loss at the time of contribution, and must be allocated solely to the partnership interests held by Cinda at the time of contribution to Southgate. Because Beal purchased 90 percent of Cinda's interest in Southgate in 2002, 90 percent of its built-in losses would be allocated to him as Cinda's transferee.

188. Between 2002–2005, MCA maintained an ongoing presence in China through Zhuang and Chen and periodic trips by Montgomery, who made approximately eight to ten trips to China between 2002 and 2005 in which he dealt with Southgate collections. Zhuang testified that he spent approximately 50 percent of his time from 2003–2005 in China, making five five-week trips to the country in both 2004 and 2005. During each trip, Zhuang met with Cinda, and he routinely met with Haiwen and others regarding collection efforts on the Southgate portfolio. While in the United States, Zhuang frequently communicated with Cinda and others in China regarding collections issues and frequently updated Montgomery.

189. Zhuang visited Cinda's branch offices and collected and reviewed information regarding the GALs and Positive Loans. Zhuang and Montgomery repeatedly made requests and recommendations to Cinda regarding the realization of GALs and Positive Loans.

190. At the time the decision was made to partner with Cinda, Montgomery anticipated that Cinda would aggressively service the NPLs. In fact, the AMCs' servicing efforts led debtor SOEs to complain to the Chinese government about their aggressiveness by late 2003 or early 2004. Despite MCA's efforts, starting in early 2003, Cinda's collections on the Southgate portfolio were not satisfactory. While certain issues were beyond Cinda's control—for example, the near-pandemic outbreak of the respiratory disease in humans known as Severe Acute Respiratory Syndrome, or SARS, in China in early 2003 all but halted collections efforts for four to six months—Cinda often ignored direct requests or instructions from MCA to the detriment of Southgate's collections. Particularly problematic was the fact that, in violation of its agreements with Southgate and over Southgate's objections and instructions to the contrary, Cinda repeatedly sold NPLs Southgate had identified as "nuggets" for collection. Southgate believed, in part based on the Zhongyu valuation, that the loan portfolio should have been significantly more profitable than Cinda's collections reflected.

191. To help improve collections, in December 2003, Montgomery retained litiga-

tor Jonathan Reich ("Reich") of De Castro to review MCA's activities and develop a strategy for future collections. Reich reviewed the portfolio and discussed with Beal and Montgomery a number of alternatives, including individualized dispositions, revising the LSA, hiring a Chinese collection team, suing Cinda based on its failure to perform, and seeking new collection partners. Reich traveled to China and met with Cinda regarding their collection efforts, and sent Zhuang to visit Cinda branch offices on a regular basis. Notwithstanding these efforts, Cinda's servicing efforts did not improve.

192. By 2004, Southgate looked to replace Cinda as servicer, and considered a number of collection alternatives. Starting in early 2004, Southgate looked into setting up its own collections entity in China—a wholly-owned foreign enterprise, or "WOFE"—primarily to handle the GALs and Positive Loans. Southgate along with Haiwen worked for months to obtain the necessary approvals for the WOFE, but ultimately its efforts were fruitless. Southgate investigated hiring other servicers, focusing in particular on purchasers of the NPLs who had achieved success in their collection efforts. Montgomery and Reich held meetings in China with potential replacement servicers, to no avail.

193. Reich found the value of the Southgate NPL Portfolio was less than what he had been led to believe by reading the Zhongyu appraisal, concluding that Zhongyu "may only have relied on documents provided to it by the seller and that it may not have conducted any independent analysis of the borrower's ability to repay loans or even that they were still in existence." Reich raised the possibility of legal action against Zhongyu because its appraisal of the Southgate NPL Portfolio was so inaccurate.

194. In September 2004, Reich wrote a letter to Cinda complaining about its efforts. In response, Cinda revealed an IRS inquiry into another investor in a Chinese NPL tax shelter transaction and issued a veiled threat to disclose the Southgate transaction to the IRS. Because of this apparent threat by Cinda to contact the IRS and changes in Chinese government policy, Reich later apologized to Cinda and backed off from threatened litigation.

195. Southgate continued collection efforts until the beginning of 2005, but it never achieved what it considered to be a satisfactory collection rate.

196. A number of factors led to Southgate's poor servicing efforts, including: (1) the vast cultural divide between Southgate and the interested Chinese parties; (2) Cinda's failure to compensate its branches properly for their collection efforts; (3) the reluctance of Cinda to collect the Chinese government-guaranteed GALs, which were apparently inadvertently included in the portfolio; (4) various Chinese legal and regulatory restrictions on collection activities; (5) the overarching concern on behalf of the Chinese parties that foreign investors stood to make too much money on distressed asset investments in China.

197. For many of the same reasons encountered by Southgate, the China nonperforming loan market did not live up to foreign investors' initial lofty expectations. Many early investors found the non-performing loan business in China to be inefficient and unprofitable, and they have now withdrawn from the market. Most of the pitfalls that hindered Southgate and other non-performing loan investors, however, only became apparent after Southgate had acquired its portfolio. In or around 2004, the Chinese government changed its rules on foreign nonperforming loan investors; among other things, portfolios transferred

to foreigners could no longer include loans backed by a government guaranty.

198. By the end of the second quarter of 2005, Cinda finished resolving the entire Southgate NPL portfolio. The total net collections on the NPL portfolio, after the 25 percent servicing fee to Cinda and other expenses, were approximately $10.69 million.

### R. The Martel Restructure and GNMA Repo Transactions

199. Even though 90 percent of the built-in loss on the sale of NPLs in 2002 (roughly $265 million) was allocated to Beal, he could only take a tax deduction on his individual tax return to the extent of his outside basis in Southgate (i.e., the amount he invested in or contributed to Southgate, including his share of partnership liabilities).

200. For Beal to take advantage of the losses from the sale of NPLs under U.S. tax law, he needed to increase, or "build," his outside basis in Southgate. Montgomery began these "outside basis" discussions with Nass and Bernknopf in June 2002 and spoke directly with Beal in the fall of 2002.

201. As of December 25, 2002, Beal's outside basis in Southgate was the cost of his investment, which included the $19,407,000 paid for 90 percent of Cinda's interest in Southgate, the $8.5 million placement fee paid to Deutsche Bank, and a $625,000 loan to Southgate.

202. Faced with a built-in loss that, while properly allocated to him, exceeded his outside basis in Southgate, Beal either had to leave the losses in excess of his outside basis "suspended" for future years or increase his outside basis in the Southgate partnership interest that he held through Martel to utilize the losses more fully in 2002. Beal recognized that if he utilized the tax basis by contributing assets to Southgate, in the future he would recognize income equal to the basis utilized. Stated differently, by building his basis in 2002, Beal would receive current tax losses and offsetting future tax gains.

203. By memorandum dated November 11, 2002, Nass and Bernknopf advised Montgomery about how Beal could build his outside basis in Southgate. Nass and Bernknopf advised Montgomery and Beal about various alternatives by which Beal could "build" outside basis in Southgate under Section 705, so that Beal could take advantage of the high basis Southgate claimed for the Southgate portfolio. Among other things, this memorandum describes what later became the repurchase ("repo") transaction involving Government National Mortgage Association ("Ginnie Mae") securities ("GNMA" securities) with UBS PaineWebber, Inc. ("UBS") that Beal entered into in December 2002.

204. The November 11, 2002, memorandum by Nass and Bernknopf shows that tax considerations largely motivated Southgate to change the "basis build" from a repo transaction involving Treasury securities, the original idea in June 2002, to a repo transaction involving GNMAs to lower the risk of interest-rate fluctuations.

205. Thus, to take advantage of the deferral of taxable income and accomplish some non-tax business purposes, Beal and Southgate entered into the "Martel Restructure" and "GNMA Repo" transactions at the end of 2002. The end result of these transactions, described in detail *infra*, was that between December 25 and December 31, 2002, Beal contributed an additional $180 million of GNMA securities to Southgate, in an effort to create basis in the partnership that would allow him to deduct most of the losses allocated to him.

206. The Martel Restructure and GNMA Repo transactions were planned and executed with the assistance of De Castro. Nass and Bernknopf offered advice on building Beal's basis in memoranda

dated November 12, 2002, November 24, 2002, and December 25, 2002.

### i. The GNMA Repo Transaction

207. GNMAs are fixed-rate, mortgage-backed securities. GNMAs are not considered to have credit risk; however, they are subject to interest rate risk—the risk that fluctuations in market interest rates affect the market value of GNMAs.

208. On December 27, 2002, Beal contributed to Martel GNMAs with a fair market value of $180,558,175 and a $300 million face-value amount. The GNMAs were "platinum securities"—carrying the full faith and credit guaranty of the United States with Ginnie Mae guaranteeing timely payment of principal and interest—bearing 7 percent annual fixed interest and with a maturity date of September 15, 2031. Beal had received the GNMAs in a dividend distribution from a subsidiary of Beal Bank.

209. After Beal contributed the GNMAs to Martel, Martel entered into a "repo" transaction with UBS Paine Webber Inc., pursuant to which Martel sold a portion of the GNMAs to UBS for $162 million. Pursuant to the Master Repurchase Agreement (the "Repo Agreement") that governed the deal, Martel was required to repurchase the identical GNMAs from UBS (at such time as Martel elected) for the price paid by UBS, plus a daily interest factor applied to the daily proceeds balance. Thus, the repo transaction essentially functioned as a $162 million loan from UBS to Martel that was secured by the GNMAs.

210. Martel received the $162,000,000 in repo proceeds from UBS on or about December 27, 2002. On or about December 27, 2002, Martel distributed those repo proceeds to Beal. In exchange, Beal absolutely and unconditionally agreed that upon Martel's demand, he personally would pay Martel's obligations to repur-chase the GNMAs pursuant to the Repo Agreement (the "Repo Guaranty"). Beal immediately injected the $162 million he received from Martel back into Beal Bank as capital.

211. In such a repo transaction, the "haircut" or "margin" is the difference between the value of the securities that the counterparty (here, Martel) sells in the repo transaction, and agrees to repurchase from UBS, and the cash paid by UBS to the repo counterparty, Martel.

212. The GNMA repo transaction between Martel and UBS provided for a 5 percent haircut. UBS required a 5 percent haircut, rather than its standard 3 percent haircut for repo transactions, because Martel was not a financial institution, but a legal entity of which Beal was the sole beneficial owner. Instead, the amount by which the value of the GNMA securities exceeded the $162 million cash paid by UBS to Martel actually approximated a haircut of 11 percent.

213. The Repo Guaranty is enforceable by any judgment creditor or trustee in any future bankruptcy of Martel.

214. Under the GNMA Repo Agreement, UBS had the right to liquidate the GNMAs it held as collateral upon a default by Martel in satisfaction of the repo obligation. Martel's failure to meet the margin requirement would put it in default under the Repo Agreement.

215. On December 27, 2002, Beal also entered into a side agreement with UBS, providing that all transactions related to the Repo Agreement must be personally approved by Beal. That contract provided that UBS could not liquidate the GNMAs without Beal's permission.

216. Beal executed an agreement between himself and Martel, his single member LLC, agreeing that when the repo obligations became due, Martel would

make written demand on Beal to pay any amounts due and that Beal would pay them; this was done in accordance with tax advice Beal received from De Castro.

217. Correspondence from Nass and Bernknopf to Montgomery indicate that Beal's guarantee was drafted and modified to satisfy at-risk requirements while only "nominally" expanding Beal's personal exposure.

### ii. The Martel Restructure

218. On December 31, 2002, Martel distributed its interest in Southgate to Beal.

219. On December 31, 2002, Beal contributed his interest in Martel to Southgate, thereby contributing the GNMAs that were in Martel to Southgate. Beal was credited with a capital contribution to Southgate of $18,558,175 ($180,558,175 value of GNMAs less $162,000,000 in distributed repo proceeds).

220. On December 31, 2002, MCA contributed a promissory note to Southgate in the amount of $187,456.

221. Eastgate, the subsidiary of Cinda, did not make any additional capital contributions to Southgate in connection with the Martel Restructure. Neither Cinda nor Eastgate were signatories to the Second Amendment to the Southgate Operating Agreement or the Agreement to Restructure Southgate, nor was any written documentation sent to Cinda or Eastgate notifying them of the reduction of Eastgate's interest in Southgate. The Contribution Agreement did not require either Eastgate's consent to the Martel Restructure or that notice be provided to Eastgate. Although the Martel Restructure reduced Eastgate's percentage interest, its dollar interest remained the same.

222. After the Martel Restructure, Beal's percentage interest in Southgate increased to 93.9377 percent, MCA's remained at 1 percent, and Eastgate's was reduced to 5.0623 percent.

223. The Southgate Operating Agreement and Martel Operating Agreement were amended to reflect the Martel Restructuring, Beal's admission as a member—unlike stockholders in corporations or partners in partnerships, investors in LLCs are "members"—of Southgate, the contribution of Martel to Southgate, and Southgate's admission as a member of Martel. The Second Amendment to the Southgate Operating Agreement expressed the parties' intent that Southgate and its members participate in the gain on the GNMAs through allocation of post-contribution gains and losses based on their interest in Southgate: "Whereas Beal is willing to contribute his entire 100% membership interest in Martel to [Southgate] so that [Southgate] can participate in the [GNMAs] owned by Martel."

224. Under the terms of the applicable agreements with respect to the Martel Restructure, Beal was appointed as the sole manager of Martel. That appointment was irrevocable for so long as Martel owned the GNMAs and/or Beal was obligated to pay any amount with respect to the Repo Agreement.

225. In his capacity as the sole manager of Martel, Beal had the absolute right in his sole discretion to: (i) contribute additional securities to Martel; (ii) cause Martel to distribute securities and/or all payments received with respect to any securities to Beal (thereby reducing Beal's capital account in Southgate); (iii) direct the purchase and sale of all securities by Martel (and allocate any gain or loss as set forth below); (iv) cause and direct the creation and termination of the Repo Agreement by Martel; (v) direct the use and application of all proceeds from the Repo Agreement by Martel (including advancing such proceeds to Beal without any interest obligation other than Beal's obligation to pay the repurchase price under

the Repo Guaranty); and (vi) direct any and all other matters pertaining to securities and/or the Repo Agreement affecting Martel.

226. Any distributions from Martel to Beal under Beal's authority as sole manager of Martel did not give rise to any obligation of Southgate to make any distributions to any other members.

227. All interest accruing with respect to the GNMAs following the Martel Restructure was allocated to Beal. Likewise, any amount required to be paid in connection with the Repo Agreement was borne by and allocated to Beal.

228. Any gain or loss attributable to the GNMAs held by Martel was to be allocated among the Southgate members in accordance with their percentage interests in Southgate, except that to the extent the value of any GNMAs owned by Martel at the time of Martel's contribution to Southgate is different that the outstanding principal balance plus accrued and unpaid interest on the GNMAs at such time, then such difference (gain or loss) is to be solely allocated to Beal. The Government's expert opined that this scenario could be worth as much as $13 million to Beal.

### iii. Tax Effects of the Martel Restructure and GNMA Repo

229. Despite the complex nature of the Martel Restructure and GNMA Repo transactions, Plaintiff contends the principle behind the Martel Restructure is straightforward. Upon their distribution from the Beal Bank subsidiary, Beal's basis in the GNMAs equaled their fair market value, or $180,558,175.

230. When Beal contributed the GNMAs to Southgate, his outside basis in Southgate increased by his basis in the GNMAs, or $180,558,175. Beal's basis simultaneously was decreased by Southgate's assumption, through its ownership of Martel, of the $162 million Repo loan

liability. Beal's basis, however, was further increased in an amount equal to his share of the Repo liabilities resulting from Southgate's assumption of the Repo loan, and Beal's guarantee thereof, or $162 million, payable on demand with one-day's notice. After distributing the $162 million in repo proceeds to Beal, Martel—as a single-member LLC—would not have been able to pay back the loan absent Beal's personal guaranty. The Guaranty waived any right of indemnification, subrogation, reimbursement or similar rights. UBS consented to Martel transferring the $162 million in repo proceeds to Beal personally after receiving the guaranty.

231. In form if not substance, Beal contributed $180,558,175 in GNMAs that secured a $162,000,000 loan that Beal had personally and unconditionally guaranteed.

232. Therefore, as a result of the Martel Restructure and GNMA Repo transactions, Beal was treated as having contributed an additional $180,558,175 to Southgate, thereby increasing his outside basis in Southgate and theoretically allowing him to utilize more fully the Southgate losses that had been properly allocated to him. As of December 31, 2002, Beal's claimed total basis in Southgate was $210,473,125.

233. Southgate properly maintained the members' capital accounts in connection with the Martel Restructure and GNMA Repo transactions. The Southgate Operating Agreement defines each member's "Membership Interest" as a member's share of Southgate's profits and losses and the member's right to receive distributions from Southgate. Each member's capital account tracks the amount of each member's Membership Interest at any given point in time. Each member's capital account generally equals: (i) the amount of cash or net fair market value of property that it contributes to Southgate,

plus (ii) such member's share of Southgate's net income, minus (iii) the sum of: (A) such member's share of Southgate's net loss, (B) 100 percent of the amounts distributed to such member, and (C) 100 percent of the amounts withdrawn by such member. Upon termination of the partnership, after making payments to creditors, liquidating distributions would be made to the members in proportion to their Membership Interests.

234. In accordance with the Operating Agreement, when Beal contributed the GNMAs to the Southgate partnership he received a capital account balance in Southgate of $36,036,175—equal to Beal's capital account balance of $17,478,000 immediately preceding the contribution plus the $18,558,175 fair market value of the GNMAs at the time of the contribution, net of the $162 million loan they secured.

#### iv. The Martel Restructure and GNMA Repo had Little Economic Substance

235. The Martel Restructure and GNMA Repo transactions had some economic substance, as all of Southgate's partners had a reasonable possibility of profiting from the GNMAs after their contribution.

236. Barnhill, the Government's proffered expert on the Martel Restructure and GNMA Repo transactions, testified that the value to Southgate of the GNMA contribution could be as much as $13 million, although the "most likely" value was between $100,000 and $700,000.

237. The Government's arguments with respect to the economic substance—or lack thereof—of the Martel Restructure and GNMA Repo transactions focus on two issues. The Government's first contention is that Martel's contribution of the GNMAs to Southgate was illusory. The Government's second argument is that Beal was not truly at risk on the Repo

Guaranty because there was only a remote chance that the guaranty actually would be called.

#### v. Martel's Contribution of Assets was Effectively Illusory

238. Although Southgate's partners could share in any appreciation of value of the GNMAs, the Second Amendment to the Southgate Operating Agreement granted Beal the unqualified option to cause Martel to distribute the GNMA securities to himself, without Southgate incurring any obligation to make any distributions to its other members. Southgate never made any distributions to Beal/Martel's partners, MCA and Cinda.

239. The Government, through Barnhill, argues that Martel's contribution of the GNMAs to Southgate was illusory because Beal could redistribute the GNMA proceeds back to himself without the obligation to make distributions to the other Southgate members. As Montgomery testified, the Southgate Operating Agreement requires that any gain inherent in the GNMAs be allocated among the Southgate partners in accordance with their percentage interests in Southgate and allocated to their capital accounts. Partners receiving a capital account credit for their percentage interest share of this gain receive an offsetting distribution upon liquidation.

240. To the extent the value of any GNMAs owned by Martel at the time of Martel's transfer to Southgate was different than the outstanding principal balance plus accrued and unpaid interest on the GNMAs at such time, any gain or loss attributable to such difference was to be solely allocated to Beal.

241. Barnhill further contends that Beal could simply hold the GNMAs in Martel until Southgate terminated and thereby deprive the other partners of their shares of the GNMAs. The evidence

shows GNMA proceeds were distributed to Beal in 2006, and his capital account was reduced accordingly. Moreover, Barnhill's position appears based on the assumptions that 1) the Southgate partnership would survive for its entire 25–year term, and 2) during that entire term, either the GNMAs would not appreciate or Beal would ignore any potential gains to be made as a result of such appreciation and leave the GNMAs in Southgate to avoid having to distribute proceeds to Southgate's partners.

242. Assuming that Beal could distribute the GNMAs to himself, the Southgate Operating Agreement provided that Southgate's other partners would not be deprived of their share of the assets. A distribution would require a revaluation of the GNMAs. The gain resulting from any appreciation in those assets from the time they were contributed would be allocated to all of Southgate's partners in accordance with their percentage interests prior to the distribution. Furthermore, MCA and Cinda would have had a larger share of Southgate's other assets equal to their share of the gain that was distributed to Beal, and Beal would have a proportionately smaller share of Southgate's other assets.

243. Barnhill assumed that Beal would simply distribute the GNMAs back to himself without sharing any proceeds with the other two members of Southgate because it is in his "rational economic self-interest" to do so. This argument does not capture the full breadth of the concept of "rational economic behavior." As Southgate's expert, Dr. Ray Perryman ("Perryman") told the Court in response to its questioning, rational economic behavior encompasses more than short-term economic interests.

244. Beal never exercised his option to share any gains from the GNMAs with Southgate's other members, Cinda and MCA. Southgate's accounting books and records reflect that, from the execution of the GNMA repo transaction in December 2002 through the presentation of evidence, Southgate allocated all income from the GNMAs to Beal, and never recorded any allocation of income from the GNMAs to MCA or Cinda.

245. All interest accruing with respect to the GNMAs following the December 31, 2002 restructuring transaction was allocable to Beal and, in fact, was allocated to Beal. Any amount that was required to be paid in connection with the Repo Agreement was borne by and allocated to Beal.

246. In essence, on December 31, 2002, Beal "flipped" Martel's and Southgate's positions in the chain of ownership. Before the restructuring, Beal was the sole owner of Martel and Martel owned an 89.1 percent interest in Southgate; after the restructuring, Beal owned a 93.9377 percent interest in Southgate and Southgate was the sole owner of Martel.

247. After these transactions, on December 31, 2002, Beal's stated interest in Southgate increased from 89.1 percent to 93.9377 percent, Cinda's/Eastgate's stated interest declined from 9.9 percent to 5.0623 percent, and MCA's stated interest was unchanged at 1 percent.

248. There was no substantive non-tax economic reason for Beal to transfer Martel and the GNMA repo transaction to Southgate in the December 31, 2002, restructuring transaction because Beal relinquished nothing of economic value, and Southgate and its members (other than Beal) received little of economic value. Beal's proffered rationales of portfolio diversification and additional net equity contribution to further the partners' goal of using Southgate for other Chinese business, taken in context of the transaction, do not amount to substantive business purposes.

249. Beal's contribution of Martel to Southgate added no economic value for Beal, because his entitlement to the income from the GNMAs was no different than it would have been if Beal had not transferred Martel to Southgate. Beal could have entered into the same GNMA repo transaction outside of Martel and achieved functionally identical risks and returns.

250. From Southgate's perspective there was no economic benefit served by Beal's alleged contribution of Martel and the GNMA repo transaction to Southgate. Beal personally received all of the potential benefits, and retained all of the risks, of the GNMA repo transaction. Given Beal's option to distribute Martel's assets to himself, to the exclusion of Southgate and its other members, Southgate had only a small possibility of realizing an economic profit from the alleged contribution of Martel and the GNMA repo transaction.

251. The GNMA transaction did not expand Southgate's equity base to allow it to engage in more NPL transactions. Southgate never engaged in more NPL transactions. Instead, Beal set up separate entities, including Southbrook Master Fund, LLC, Classic Paragon, LLC, and Pinnacle Management, LLC, to execute other Chinese NPL transactions.

### vi. Beal had Only Remote Risk on His Guaranty

252. On December 26, 2002, Martel faxed an executed trading authorization to Fritz Luedke ("Luedke"), a Senior Vice President at UBS. Under the trading authorization, UBS agreed that all transactions on the Repo account "must be authorized either orally or in writing by D. Andrew Beal on behalf of Martel." This agreement was made "[n]otwithstanding anything contained in the Repurchase agreement." UBS did not execute the trading authorization until December 30, 2002.

253. On December 27, 2002, Beal executed the Repo Guaranty for the benefit of Martel. Under the Repo Guaranty, when obligations to repurchase the GNMAs became due, upon written demand by Martel, Beal was required to promptly pay such amounts. Beal's obligations were "absolute and unconditional." The Guaranty was enforceable by "Martel, any judgment creditor under such repurchase agreements, or any trustee in bankruptcy," including UBS.

254. On December 27, 2002, Luedke faxed both the trading authorization and the Repo Guaranty to Tom Magdziak ("Magdziak"), also of UBS. Luedke called these "common" agreements, required by UBS and "every major . . . bond house." Luedke noted that UBS would be receiving originals of the trading authorization, the Guaranty, and the Master Repurchase Agreement.

255. In support of its argument that Beal was not at risk on the Repo Guaranty, the Government's expert, Barnhill, interprets testimony from UBS, and alleges that UBS had not requested the Guaranty. Magdziak testified that UBS does not always require a personal guarantee, that they did not initially ask for one, and that he did not recall if they specifically asked for a guarantee in this case. Luedke further testified that a document containing the Guaranty "would be the type of document [the] UBS credit department would require." This finding is further supported by UBS' checklist that it sends out to investors—one option that may be checked is "guarantee letter."

256. De Castro believed a guarantee would be required, noting in its November 24, 2002, memo that "[i]n all likelihood, [Beal's] guarantee would be required by the repo counter-party . . . ."

257. UBS required the Repo Guaranty because Martel was not the typical counterparty for this type of deal—it was neither a bank nor other financial institution, and it was a new entity without any other substantial assets. UBS did not execute its consent for Martel to transfer the $162 million in repo proceeds to Beal until after it had received the signed Repo Guaranty.

258. Beal had some risk with respect to his unconditional guaranty of Martel's repo obligations to UBS. Both parties' witnesses agreed that under a so-called "doomsday scenario"—which assumes that, upon liquidation of a partnership, all of the partnership's liabilities become due and payable, and that the partnership's assets (e.g., the GNMAs posted as collateral with UBS) are worthless—Beal would be personally required to satisfy his obligations under the Repo Guaranty. The Treasury Regulations set forth this "doomsday scenario" as a test for whether a party is at risk. Treas. Reg. § 1.722–1.

259. In the event that the market value of the GNMAs fell significantly within a short period of time, the margin requirement under the Repo Agreement would have been triggered before any purported guarantee executed by Beal with Martel would have been called on.

260. The record reflects various plausible scenarios in which the value of the GNMAs could drop to the point where the Repo Guaranty would be at risk of being called. These include (1) a fluctuation in interest rates relative to the fixed rate of the GNMAs that would decrease the market value of the GNMAs precipitously; (2) a "systemic failure" of the entire financial system; (3) a situation in which UBS hypothecated the GNMAs—i.e., enter into another derivative contract involving those GNMAs—to a counterparty that failed; and (4) if the GNMA certificates were fraudulent or technically deficient.

261. Barnhill posits that at the time of the GNMA Repo transactions, there was a less than 2 percent chance that the Repo Guaranty would be called—odds he characterized as "less than remote." Based on the evidence presented at trial, the Court finds that the Repo Guaranty would not have been called except under the most dire circumstances, ones that were virtually unthinkable in 2002. Yet as the worldwide economy has deteriorated, systemic risks to the financial system have increased, resulting in a number of institutions having to perform financial obligations that they once considered to be "remote" possibilities. Barnhill conceded that his own modeling discounted the possibility that a systemic risk could have resulted in the Repo Guaranty being called.

262. Barnhill uses a "Monte Carlo" pricing model to calculate probabilities that the Repo Guaranty would get invoked. While use of such models is reasonable in certain circumstances, they are inexact and based on theoretical constructs that are not wholly applicable here. One phenomenon that could trigger inaccuracies would be a change in the liquidity available in the mortgage market.

263. Barnhill concluded that, because the model shows a positive equity value in the GNMAs with a 300 basis point increase in mortgage rates, there is only a remote probability of the Repo Guaranty being invoked. He admitted, however, that an additional margin call would likely be needed if rates moved upward by 300 basis points or more. Given that UBS agreed not to make any transactions involving the GNMAs without Beal's consent, UBS may not have been able to implement such a margin call. In that event, as Beal testified, UBS would have had only the Repo Guaranty upon which to call.

264. For Beal's purported guarantee to be called on, interest rates would have had to increase by approximately 360 basis points before UBS could liquidate the GNMAs held as collateral. Barnhill's model reflects that Martel's net equity position turns negative with an increase in mortgage rates of about 360 basis points and significantly negative at 400 basis points.

265. The largest fluctuations in interest rates over a one-month period observed since 1971 was –207 basis points and +224 basis points. Based on historical interest rate data, the likelihood of a 360 basis-point swing within a one-day period is effectively zero.

266. The principal and interest payments from GNMAs are guaranteed by the full faith and credit of the United States government. Thus, if GNMAs are held to maturity, there is effectively no risk of loss.

267. Government regulators may evaluate the performance of financial institutions by assuming interest rate fluctuations of 300 basis points in either direction, thus indicating a potential legitimate concern for such outcomes. As Southgate's expert, Perryman, concluded: "[W]hile the probability of such movements is not high according to the standards of the recent past, it is quite possible that circumstances could have occurred that would have generated negative equity, and such conditions are not without historical precedent."

268. Although GNMAs are subject to interest rate risk, i.e., the risk that fluctuations in market interest rates may cause the market value of GNMAs to fluctuate, the rapid rate at which GNMAs were prepaying in 2002 significantly reduced the chance that UBS would call Beal's personal guarantee of Martel's liability under the GNMA Repo Agreement due to fluctuations in the market value of the GNMAs.

### vii. Alleged Business Purposes behind the Martel Restructure and the GNMA Repo Transactions

269. Southgate concedes that Beal undertook the Martel Restructure and GNMA Repo transactions in part to increase his outside basis in Southgate. The Court further finds that although there were some non-tax business purposes behind the transactions offered as post-hoc rationales, the primary motivation for these transactions was tax savings.

270. At the time of the Martel Restructure and GNMA Repo transactions, Montgomery understood, based on the advice he had received from De Castro and Coscia, that for tax purposes, there need not be a business purpose behind the transactions. Montgomery testified that there were means by which Beal could have built basis in Southgate that would have had no business purposes. Indeed, increasing basis to enable a taxpayer to utilize losses is a common year-end tax strategy.

271. First, the structure of the transactions served some legitimate business purposes. The GNMAs were contributed to Southgate through Beal's contribution of Martel, rather than contributed by Beal directly, because UBS wanted the GNMAs owned by a "clean entity . . . with no other activities that could potentially cause liabilit[y]," and because that transaction structure required no further approvals or paperwork. In any event, contributing the GNMAs through Martel rather than directly did not impact Beal's basis in Southgate. For regulatory reasons, the "repo" form of the transaction with UBS is relatively typical for borrowings involving U.S. government securities.

272. Second, the Martel Restructure and GNMA Repo transactions resulted in $18,558,175 of net equity being contributed to Southgate, which allowed the partnership to pursue additional investments in China. Specifically, Montgomery pointed

to this new capital contribution in negotiations with Huarong to establish that Southgate and its principals were serious investors in Chinese non-performing loans.

273. Third, the Martel Restructure and GNMA Repo transactions diversified Southgate's investment portfolio. Prior to the contribution of the GNMAs, Southgate's only assets were Chinese non-performing loans; because there is no expected correlation between the performance of Chinese non-performing loans and GNMAs, this diversification represents a potential benefit to Southgate. Perryman said this diversified portfolio was important for strengthening Southgate's capital base and opening up new investment opportunities.

274. Fourth, the GNMA Repo transaction allowed Beal Bank to reduce its interest rate risk. After Beal Bank acquired $1.3 billion in fixed-rate GNMAs, banking regulators criticized the Bank for having too much of its portfolio in fixed rate risk without matched funding. To address this concern, through the GNMA Repo transaction, Beal monetized the GNMAs—via the $162 million he received from UBS—and then "reinjected" that cash into Beal Bank. The transaction thereby increased the Bank's capital while simultaneously diversifying the Bank's portfolio.

275. Fifth, the Martel Restructure and GNMA Repo transactions allowed Southgate's partners to share in any gain or loss from the market value of the GNMAs in the event of a sales transaction.

276. Finally, from Beal's perspective, Martel's contribution of $180 million in capital increased his share of the profit percentage in Southgate.

**S. Professional Tax Advice on Southgate Transaction and Related Tax Returns**

277. Beal has no professional or educational experience in federal tax law, other than the advice he has received from tax professionals in preparing federal tax returns for himself and entities that he manages or controls. Beal obtained oral and written advice regarding the tax consequences of the transactions from De Castro and the accounting firm Coscia Greilich & Company ("CGC").

278. Beal did not "shop" for an opinion that justified his tax position; he did not ask anyone other than De Castro, and then CGC, for a tax opinion regarding the transactions at issue. Rather, Beal and Montgomery sought advice about the appropriate tax treatment for the 2002 transactions to confirm they were acting appropriately and correctly.

279. Neither De Castro nor Coscia had a known conflict of interest in rendering advice to Southgate and its members.

**i. De Castro**

280. De Castro was retained in 2002. Montgomery originally retained De Castro to review the Jamaican NPL transaction and advise whether that transaction could have been structured to provide tax benefits. When Montgomery retained De Castro, he was already considering possible transactions in Chinese non-performing loans. De Castro did not originate the idea for the transactions. De Castro neither marketed or sold the transactions as a pre-packaged product to Southgate or Beal, nor was De Castro a promoter of the transactions at issue.

281. De Castro employs qualified tax lawyers.

282. Once engaged, De Castro provided oral and written tax advice to Southgate and its members regarding the transactions at issue. De Castro also drafted transactional documents, participated in negotiations, and provided tax advice—or-

dinary tax planning work—regarding every aspect of the Southgate transactions.

283. De Castro helped obtain representations and legal opinions from Cinda, Sinobridge and Haiwen. De Castro also had contact with Deutsche Bank regarding Southgate. De Castro reasonably believed that the representations made by Cinda, Sinobridge, and Haiwen were complete and accurate.

284. De Castro also authored a tax opinion letter dated October 15, 2003, which Plaintiff now relies upon as a defense to the civil penalties that are due under Section 6662, regarding the Form 1065, U.S. Partnership Return of Income, filed by Southgate for its 2002 tax year.

285. The attorneys at De Castro primarily responsible for the engagement were Menasche Nass and Andrew Bernknopf. Nass is a tax attorney who has been practicing for twenty-six years in business and taxation law, and is a name partner in De Castro. Bernknopf is a tax attorney with more than eighteen years experience in providing tax advice to clients for complex transactions. Bernknopf has an LLM in taxation.

286. From May through August 2002, De Castro attorneys Nass and Bernknopf had regular discussions with both Beal and Montgomery about the structure of the Southgate transaction.

287. Nass sent Montgomery an outline of the tax opinion that De Castro would prepare in support of the tax loss, which included a list of the issues that would be discussed in the tax opinion and that the opinion would be a "more likely than not opinion" on Southgate's Chinese NPL transaction. Montgomery never intended to take, or had any need for, the tax losses for himself. De Castro used generic portions of another tax opinion "rather than reinvent[ing] the wheel" in drafting its own opinion for Southgate.

288. On October 15, 2003, De Castro issued a tax opinion to Beal regarding the federal tax consequences of Beal's investment in Southgate. De Castro concluded that "there is a greater than 50 percent likelihood that the tax treatment [taken by Southgate and its members] will be upheld if challenged by the IRS, [and] the IRS should not be successful were it to attempt to impose a penalty against [Southgate and its members]." The opinion was largely drafted by Nass and Bernknopf.

289. In connection with De Castro's work on their tax opinion, Southgate and its members, including Beal, disclosed all pertinent facts to De Castro and made no representations or assumptions that it knew or had reason to know were inaccurate. In addition, De Castro was in contact with Beal, Montgomery, Haiwen, Sinobridge and Zhongyu.

290. De Castro made no independent investigation of the facts and information underlying their tax opinion, but was not required to independently verify the factual situation. De Castro assumed as true the representations in the Southgate transaction documents, some of which De Castro's own lawyers had written.

291. De Castro's advice reflected typical tax planning, even though related to a highly complicated transaction. This was a "sort of everyday lawyering," in the words of Plaintiff's expert David Weisbach ("Weisbach"), a professor at the University of Chicago Law School.

292. The facts and documents De Castro relied upon are listed in the De Castro opinion. The opinion was based on De Castro's consideration of the relevance and persuasiveness of material facts and authorities, as well as its involvement in structuring and negotiation the transactions.

### ii. Coscia Greilich & Company

293. In the summer of 2002, while De Castro was starting to draft its tax opinion, Montgomery approached CGC regarding the Southgate investment. Late in 2002, CGC was asked to prepare a tax opinion on the Southgate transaction for Beal. CGC provided a written opinion dated April 2003 to Southgate and its members regarding the transactions at issue.

294. The CGC opinion was drafted by Matthew Coscia. Coscia is a certified public accountant with more than thirteen years experience in tax planning and transactional services. Coscia had extensive prior experience working with Montgomery.

295. Southgate and its members, including Beal, reasonably believed Coscia to be competent. CGC are qualified tax advisors.

296. Southgate and its members fully disclosed all pertinent facts to Coscia and made no representations or assumptions which he knew or had reason to know were inaccurate. Although Coscia did not participate in the Southgate transactions, he had access to the relevant, material information.

297. Coscia reviewed the representations and legal opinions obtained from Cinda, Sinobridge, and Haiwen. Coscia reasonably believed that the representations of Cinda, Sinobridge, and Haiwen were complete and accurate.

298. The facts and documents CGC relied upon are listed in the opinion. The opinion was based upon Coscia's analysis of, and took into account the relevance and persuasiveness of, pertinent facts and authorities.

299. On April 30, 2003, CGC issued a tax opinion regarding the Southgate transactions. The CGC opinion sets out that it is more likely than not that, inter alia: (1) Cinda's basis in the NPLs should equal its acquisition costs from CCB; (2) Eastgate's basis in the NPLs should equal the tax basis of the NPLs in Cinda's hands; (3) Southgate's tax basis in the NPLs should equal the tax basis in Eastgate's hands; (4) Martel's basis in the NPLs should equal the amount paid by Martel to Eastgate for Eastgate's interest in Southgate plus the amount of any losses of Southgate allocable to Martel; (5) Martel's basis in the GNMAs should equal the adjusted basis of the GNMAs in the hands of Beal; (5) Martel's distribution of its interest in Southgate and other assets should not change Southgate's tax basis in the Debt Portfolio; and (6) Beal's contribution of his membership interest in Martel to Southgate should increase his basis in Southgate to reflect his basis in his 100 percent ownership interest in Martel.

300. The CGC opinion concludes "that there is a greater than 50% likelihood that the tax treatment [taken by Southgate and its members] will be upheld if challenged by the IRS, [and] the IRS should not be successful were it to attempt to impose a penalty ... for positions taken on the U.S. federal income tax return with respect to the Transactions."

301. Although Coscia contacted the De Castro lawyers, De Castro and CGC drafted the respective tax opinions separately and independently. Prior to finalizing his opinion, Montgomery sent De Castro the factual portion of Coscia's opinion to confirm that Coscia's understanding of the facts was correct.

302. It was Beal's decision to obtain a tax opinion from CGC regarding the Southgate transaction, and a Beal-owned entity paid for the work Coscia performed after Beal invested in the Southgate transaction.

303. Montgomery gave Coscia a template tax opinion letter addressing these issues in the context of another transaction

involving Chinese NPLs from Cinda that Coscia used in forming his tax opinion. Coscia cut and pasted portions of his tax opinion from this template, including sections describing Montgomery's personal actions and motivations for entering the transaction.

304. Coscia made no independent investigation of the facts underlying his tax opinion, but was not required to independently verify the factual situation. He assumed as true the representations in the Southgate transaction documents and information he received from Beal and Montgomery. Beal personally reviewed Coscia's tax opinion before it was finalized and verified that the facts as pertaining to him stated in that draft were accurate.

305. Southgate and its members reasonably relied in good faith on the oral and written advice of De Castro and CGC regarding the transactions at issue.

306. Southgate carried out the transactions at issue consistently with the transactional documents and descriptions in the De Castro and CGC opinions.

307. Beal carried out the transactions at issue consistently with the transactional documents and descriptions in the De Castro and CGC opinions.

### iii. The Professional Tax Advice Obtained by Southgate and its Members was Consistent with Professional Standards and was Reasonably Relied upon by Southgate

308. Plaintiff's expert Professor Weisbach testified that the written opinions provided by De Castro and CGC met applicable professional standards and were of the nature and quality upon which a taxpayer could reasonably rely. The Government did not have an expert testify on the De Castro and CGC opinions, and no witness claimed that De Castro and CGC failed to meet professional standards or could not be reasonably relied upon.

309. Based on a review of the opinions themselves, the testimony of Nass, Coscia and others, and Weisbach's unrebutted testimony, the Court finds that the De Castro and CGC opinions met the standards for reliance on tax advice described in 26 U.S.C. § 6662, 6664, and related regulations, met the normal standards for tax advice for similar transactions, and, although they were not required to, met the standards for Covered Opinions under IRS Circular 230, which are even more strict than the standards that were in effect when the De Castro and CGC opinions were drafted.

310. Furthermore, it was reasonable and within the expected standard of care exercised by taxpayers determining whether to engage in and how to report complex transactions on their returns, for Southgate and Beal to rely on the De Castro and CGC opinions. Taxpayers in similar situations acting reasonably and exercising ordinary care rely on tax opinions of this nature and quality.

311. The De Castro and CGC opinions comply with the rules for reliance on tax advice in that they consider all facts and circumstances, analyze the relevance and persuasiveness of authorities, are not based on unreasonable assumptions, were drafted by knowledgeable professionals, unambiguously conclude that the transactions will "more likely than not" be upheld if challenged, and were not drafted under a conflict of interest.

312. The De Castro and CGC opinions anticipated the arguments raised by the IRS in the Final Partnership Administrative Adjustment ("FPAA"). The fact that the opinions do so, and that there are memoranda and draft opinions in which the advisors at both De Castro and CGC are wrestling with the various issues in the

FPAA, are further evidence of the quality of the opinions rather than evidence of a tax avoidance scheme furthered by these professionals.

313. It was therefore reasonable for Beal and Southgate to rely on the De Castro and CGC opinions.

### iv. Montgomery and Beal Consulted with Professional Tax Advisors before Filing the Relevant 2002 Tax Returns

314. Montgomery and Beal received and reviewed the final CGC opinion before Southgate and Beal filed their federal tax returns for the 2002 tax year. Coscia met with Montgomery and Beal in person to discuss CGC's advice. Montgomery and Beal met with Coscia and discussed the CGC tax opinion prior to filing the relevant 2002 federal tax returns. Montgomery and Beal received and reviewed the De Castro opinion before filing the relevant federal tax returns for the 2002 tax year.

315. Nass and Bernknopf met with Montgomery and Beal in person and also conferred by phone to discuss De Castro's advice. Montgomery and Beal discussed De Castro's tax opinion with De Castro prior to filing the relevant 2002 federal tax returns. Coscia helped prepare, and De Castro reviewed, the draft Southgate 2002 tax return. Coscia also helped prepare Beal's personal tax return. Beth Montgomery, who is Beal's long-time tax return preparer, prepared the final 2002 tax returns for Southgate and Beal.

316. Southgate's and Beal's 2002 tax returns were prepared in all material respects consistent with the advice they received from De Castro, Beth Montgomery, and CGC.

### v. The 2002 Tax Returns

317. Southgate timely filed its 2002 partnership return on October 15, 2003. Beth Montgomery signed the 2002 federal partnership tax return, IRS Form 1065, filed by Southgate as the paid preparer of the return.

318. Beal timely filed his 2002 tax return. Beth Montgomery signed the 2002 federal income tax return, IRS Form 1040, filed by D. Andrew and Simona Beal as paid preparer of the return. Beal's 2002 tax return reported an ordinary loss deduction of $216,299,142 arising from Beal's interest in Southgate.

319. Southgate's and Beal's 2002 federal tax returns were filed consistent with the advice Southgate and its partners received from De Castro and Coscia. Southgate's 2002 tax return reported and allocated a debt portfolio ordinary loss of $294,861,591 with respect to the NPLs. The amount of the deduction had a $6 million discrepancy for the FMV of the GNMAs. Southgate's 2002 tax return reported that $265,454,653 of the $294,861,591 debt portfolio ordinary loss arising from the NPLs was allocable to Beal and $29,486,159 to Cinda. Southgate reported its income and expenses and deducted losses arising from its business operations.

320. Cinda's basis in the NPLs just prior to their contribution to Southgate was Cinda's purchase price of $1,144,801,161 plus accrued but unpaid interest of $234,979,225 for a total of $1,379,780,386. Cinda received a capital account credit of $19,420 million for the NPLs. Therefore, a built-in loss of $1,360 billion existed at the time the NPLs were contributed to Southgate.

321. Under 26 U.S.C. § 704(c) and Treas. Reg. § 1.704–3(a)(7) that built-in loss was allocable to the contributing partner—Cinda.

322. Because Beal purchased 90 percent of Cinda's partnership interest on August 30, 2002, 26 U.S.C. § 704(c) and

Treas. Reg. § 1.704–3(a)(7) required that 90 percent of the built-in loss be allocated to Beal.

323. By the end of 2002, Cinda, as servicing agent for Southgate, had sold NPLs representing approximately 3,092 borrowers at auction and realized gross proceeds, i.e., without consideration of collection fees and expenses, of approximately $3.2 million.

324. Southgate's schedule shows that the "allocated purchase cost" of the NPLs sold by Cinda is $4,303,133, and after taking into account service fees and collection expenses, an actual loss on the disposition of the NPLs of $2,134,388.

325. In 2002, Southgate had claimed losses from the Sold NPLs totaling $294,861,591. Of these claimed losses, $2,011,870 were post-contribution losses, and $292,849,721 were built-in losses. The $294,861,591 of ordinary losses were reported on Southgate's 2002 Form 1065, U.S. Return of Partnership Income.

326. The $2,011,870 of post-contribution losses were allocated to each of Southgate's partners in accordance with its partnership interest: $20,119 to MCA; $101,847 to Cinda; and $1,889,904 to Beal. Of the $292,849,721 built-in loss, 90 percent, or $263,564,749, was allocated to Beal, and 10 percent, or $29,284,972, was allocated to Cinda. None of the built-in loss was allocated to MCA.

327. A$265,454,653 loss ($1,889,904 post-contribution loss plus $263,564,749 built-in loss) was allocated to Beal, and reported on Southgate's 2002 Form 1065, U.S. Return of Partnership Income, Form 10–K. A $29,386,819 loss ($101,847 post-contribution loss plus $29,284,972 of built-in loss) was allocated to Cinda, and reported on Southgate's 2002 Form 1065, U.S. Return of Partnership Income, Form 10–K. A $20,119 loss (post-contribution loss only) was allocated to MCA, and reported on Southgate's 2002 Form 1065, U.S. Return of Partnership Income, Form 10–K.

328. Beal's use of the built-in losses was only temporary. Beal realized offsetting gains in 2006 and 2007 totaling $53 million and $933 million, respectively. After all offsetting gains are taken into consideration, Beal's cash, out-of-pocket, losses equal his net loss.

329. Montgomery was not allocated any built-in loss and therefore did not receive any tax benefits from the built-in losses. He ultimately lost approximately $85,000 on the Southgate transaction.

### T. The FPAA and Southgate and Beal's Cooperation with the IRS Audit

330. In 2005, the IRS audited Beal's individual Form 1040 tax return for the 2002 tax year. The IRS focused specifically on Beal's at-risk basis in Southgate to make sure that he was entitled to deduct the losses flowing from Southgate to his personal return. The IRS made no adjustments to Beal's at-risk basis in Southgate at this time.

331. On September 23, 2006, IRS Agent Sunny Chung ("Chung"), reviewed the Southgate files for the first time. He recognized that the IRS had little time to start and complete an audit before the statute of limitations for the IRS to assess additional tax on Southgate's 2002 federal tax return expired on October 15, 2006.

332. At that point, the IRS had not contacted Beal, Montgomery, or anyone else involved with the Southgate transactions or tax returns to discuss the partnership's 2002 return. The IRS first attempted to contact Montgomery on Friday, September 29, 2006.

333. On October 3, 2006, after the close of normal business hours, Chung faxed to Montgomery an Information Document

Request ("IDR") which set October 6, 2006, as a due date for a response. Compliance with the deadline was impracticable if not impossible. The IDR sought production of sixty-two categories of documents and information; responding fully to the requests would require the production of many thousands of documents, including Chinese-language documents that the IRS requested be translated into English prior to production.

334. Also on October 3, 2006, Montgomery received via UPS Next Day Air a copy of the Notice of Beginning of Administrative Proceeding ("NBAP"). This was the first time anyone from Southgate became aware that the IRS intended to examine the partnership's 2002 tax return. The NBAP included an IRS Form 872–P that requested Southgate's consent to extend the IRS's statute of limitations to assess Southgate's 2002 return through December 31, 2006. The NBAP specifically informed Southgate that "[y]ou do not have to sign the consent to be considered to have cooperated with the [IRS] for purposes of determining who has the burden of proof in any court proceeding."

335. Shortly after Montgomery received the NBAP, Michael Cohen ("Cohen"), an attorney with De Castro, contacted Chung on behalf of Southgate and Beal. Through Cohen, Southgate and Beal offered to extend the statute of limitations to allow the parties adequate time to discuss how an audit would proceed. Cohen also proposed that the extension be limited only to those issues pertaining to Southgate, so that an audit would not involve any other issues on Beal's return. The IRS rejected Cohen's proposal.

336. On October 13, 2006, the IRS served summonses on Beal, Montgomery, and Beth Montgomery (the "Summonses"), requesting documents and personal appearances on or around November 13, 2006. The IRS had issued the Summonses a week earlier, on October 6.

337. Also on October 13, 2006, the IRS issued an FPAA to Southgate, disallowing Southgate's claimed losses arising from the Chinese NPLs. The FPAA stated that "Southgate has failed to establish that the purported partnership incurred any losses during the taxable year in question or that it is entitled to any deduction under any provision of the Internal Revenue Code." The IRS disallowed the tax losses from Southgate's sales of the NPLs, disallowed in full Southgate's allocation of the losses among its partners, and imposed substantial penalties.

338. The IRS not only denied deductions based on Southgate's built-in losses under § 704(c), but it denied all post contribution losses, and all deductions based on partnership operating expenses—travel, legal fees, etc.—as well. The FPAA also included references to foreign currency options, and includes a theory of liability under 26 U.S.C. § 482 ("Section 482") that the Government has since abandoned.

339. The IRS issued the FPAA without first speaking with Montgomery, Beal or anyone else with first-hand knowledge of the issues raised in the FPAA. With the exception of the September 29, 2006, voicemail Chung left for Montgomery, the IRS did not attempt to contact those involved with Southgate prior to the issuance of the FPAA.

i. Southgate's Response and Cooperation with the IRS

340. On October 31, 2006, Cohen contacted Chung regarding the Summonses. Cohen proposed that in lieu of compliance with the Summonses, all document productions and witness appearances could be accomplished through the discovery process in the federal litigation concerning the FPAA. While Chung informed Cohen that

he would take the proposal under advisement, he never responded further.

341. Not having heard a response to his proposal by November 3, 2006, Cohen sent Chung a letter confirming the October 31 conversation and again suggesting that compliance with the Summonses be excused both with respect to production of documents and personal appearances. The IRS did not respond to Cohen's letter.

342. On November 6, 2006, Cohen e-mailed to IRS Agent Jesse Luna ("Luna"), who by that time had taken over responsibility for the Southgate file, a copy of his November 3, 2006, letter to Chung. Cohen again inquired as to whether compliance with the Summonses could be excused and, given the "voluminous" amount of Southgate-related documents, whether the IRS would agree to an interim suspension of the Summonses.

343. On or about November 17, 2006, Cohen and Luna reached an agreement on a schedule for the production of documents responsive to the Summonses and deferring any personal appearances. The parties later agreed that all testimony called for in the Summonses would be taken by way of deposition in the federal litigation.

344. On December 6, 2006, Southgate's members made the jurisdictional deposit of the tax as required by 26 U.S.C. § 6226(e)(1) by depositing check number 024056 (for 2002).

345. On December 18, 2006, Southgate, through MCA, filed this action for a redetermination of the adjustments reflected in the FPAA under 26 U.S.C. § 6226 and 28 U.S.C. § 1346. At the time the action was filed, Southgate had a net worth less than $4 million.

### ii. Southgate's Production of Documents

346. Southgate timely produced all documents requested by the Summonses and IDRs other than duplicative transla-

tions of loan documents. Similarly, all depositions sought by the IRS have taken place.

347. In June 2007, counsel for the Government reviewed the NPL files at Beal Bank. The Government selected files to copy and translate, which files Plaintiff promptly delivered to the Government.

348. The Government translated the selected files and produced its translations to Plaintiff in September 2007. Subsequently, Plaintiff retained Interlingua, a translation service, to verify the accuracy of the Government's translations. In doing so, Interlingua created rough, uncertified draft translations, which Southgate turned over to the Government, although Southgate maintains that it was not obligated to do so. Southgate subsequently turned over all other translations created by Interlingua.

349. The Government has had adequate discovery of the NPLs and did not seek to compel further production. Translations of all 24,000 NPLs were not material to the resolution of this case. At trial, the Government did not introduce an English translation of a Chinese loan document, and did not demonstrate to the Court what use it would have made of additional English translations. The Government's expert witnesses have had the opportunity to review the NPL files and found that they were typical of Chinese loans, so there is no obviously compelling reason to obligate Southgate to produce thousands more.

350. Based on the evidentiary record presented at trial, the Court finds that Southgate cooperated with all reasonable IRS requests for meetings, interviews, witnesses, documents, and information within the meaning of 26 U.S.C. § 7491(a)(2)(B) regarding the transactions at issue in this litigation.

351. Based on the evidentiary record presented at trial, the Court finds that Southgate has substantiated its losses within the meaning of 26 U.S.C. § 7491(a)(2)(A).

352. Based on the evidentiary record presented at trial, the Court finds that Southgate and Beal have maintained adequate books and records within the meaning of 26 U.S.C. § 7491(2)(B). Southgate has retained documents that would be sufficient to substantiate its losses from the NPLs, including: documents reflecting payments made to De Castro, Haiwen and Zhongyu; Contribution Agreements, Sales Disposition Agreements, and documents from each loan file (including those NPLs that were sold to third parties). Southgate also retained its accountant's work papers used to prepare the federal tax returns at issue.

## U. The Government's "Basis–Killer" Arguments

353. The Government contends that the built-in losses were not properly allocated to Beal because of three so-called "basis-killer" arguments: (1) the NPLs were worthless, (2) Cinda was a dealer in securities prior to the time that the NPLs were contributed to Southgate, and (3) Section 482 requires a re-allocation of the loss.

### i. The Southgate NPL Portfolio was Not Worthless

354. The NPLs were not worthless before they were transferred to Southgate. The credible evidence shows the non-performing loans that were transferred from the Big Four Banks to the AMCs (and ultimately to Southgate) between 1999–2001 were real loans with value. These loans had all the characteristics of true loans: they were evidenced by proper documentation; they were enforceable in court and in bankruptcy proceedings; and

they could be subject to statutes of limitations.

355. The fact that the non-performing loans at issue were transferred to the AMCs between 1999–2001—rather than simply written off—evidences those loans had some value. The Chinese government had written off approximately 30 billion RMB worth of non-performing loans in 1997 and another 40 billion RMB in 1998. Once the AMCs took possession of the SOCBs' non-performing loans, foreign investors paid more than $26 billion between 2001–2005 to acquire interests in those loans.

356. The Government has argued that while the NPLs "as a group" had value, individual NPLs in the Southgate portfolio certainly must have been worthless. The evidence is to the contrary. As Yang testified, the regulations establishing the AMCs stated that the non-performing loans transferred to the AMCs should not include loans that were designated to be written off the books. Even if Cinda had written off the NPLs for Chinese accounting purposes, that is not necessarily determinative of whether that constitutes a write-down for United States tax purposes.

357. In the Contribution Agreement, Cinda represented that it had not written off any of the NPLs in the Southgate portfolio.

358. In an "approval notice" relating to Cinda's handling of the Southgate portfolio, the National Development and Reform Committee, a Chinese government agency with approval authority over the AMCs' economic and financial transactions, required that Cinda "process write-off procedures individually" for the Southgate NPLs "during cooperation," i.e., during the course of the Southgate partnership.

359. The Zhongyu valuation report estimated the value of the NPLs to be be-

tween 3.90 percent and 9.76 percent of face value, or between $44,673,683 and $111,798,757.

360. Third parties paid more than $3.2 million for the portion of the Southgate NPL portfolio that was publicly auctioned in 2002.

361. Yang is unaware of any specific loan in the Southgate portfolio that was worthless, and he does not know the extent to which any of the NPLs were legally unenforceable.

362. Professor Yang's view of the Southgate NPLs' "worthlessness" is based on a report purportedly prepared by Zhongyu for Cinda. Yang did not speak to anyone at either Cinda or Zhongyu; he has no knowledge about what the individuals who created the report were instructed to do; he does not know whether the report was actually issued, certified, or endorsed by Zhongyu, and; he does not know the sampling method used to prepare the report.

363. The Cinda report cited by Professor Yang is not determinative evidence of the value of the Southgate portfolio. The Government waived its objections to Zhongyu's sworn affidavit, in which Zhongyu disclaimed the unsigned report. The report bears neither Zhongyu's seal, or "chop," nor the signatures of its appraisers. The Court finds the alleged Cinda report has limited probative value.

364. The Cinda report does not demonstrate the Government's contention that the Southgate portfolio was worthless. According to Yang, only 10 percent of the loans sampled—representing 6.5 percent of the face value of the sample—were "worthless," as Yang defined the term.

365. It further appears that the alleged Cinda report was the product of Cinda's attempt to comply with the legal requirement that prior to transferring a nonperforming loan portfolio to an investor, that portfolio must be valued by a "competent state assets authority" in order to determine a "floor price for the proposed transaction."

366. In every non-performing loan portfolio, some loans will be uncollectible. As Osborn testified, however, that does not "necessarily mean the NPL doesn't have value when it's sold." In assessing a non-performing portfolio during pre-transaction due diligence, investors typically ascribe a 1 percent to 3 percent "intrinsic value" to loans about which there is little or no information, because post-sale, when more time is available and collection efforts are initiated with the borrower, additional information often comes to light indicating that value can be extracted from the loan. Even where no such information arises, as both Montgomery and Osborn testified, non-performing loans can be bundled together and sold as a package to interested investors who may have information on particular borrowers that could be key to achieving value out of a nonperforming loan.

367. The insolvency or illiquidity of a borrower does not mean that the last vestige of value has disappeared from that borrower's loan. As Borrelli testified, it would be surprising "to find an operating debtor in a category 4 [portfolio]. [T]he basic question you need answered is does that debtor have any assets that can be realized and applied to your loan. So whether it's operating or not is irrelevant." Similarly, Montgomery testified that it is "very rare" to find an obligor with tangible assets or income in such a portfolio, but recovery is possible because "there could be guarantors [or] claims against the company."

368. The fact that a debtor is in bankruptcy is not determinative of whether a nonperforming loan has value. Even where an obligor is out of business and has

no cash flow, assets or guaranty to back the loan, non-performing loans still can be sold as part of a package sale.

369. Based on the foregoing, the Court finds that the NPLs—either as a group or individually—were not worthless.

### ii. Cinda did Not Operate as a Dealer in Securities at the Time of the Southgate Transactions in 2002

370. Cinda did not operate as a dealer in securities as of the end of 2001, because at that time it was neither buying securities from nor selling securities to customers in the regular course of its trade or business. Cinda's "trade or business" through at least the end of 2001 was the receipt, management and maintenance of the SOCBs' non-performing loans—which allowed the SOCBs to clear thousands of distressed assets from their books, improve their balance sheets, and increase their lending based on creditworthiness, thereby providing liquidity to the Chinese banking system—not the buying or selling of securities. It was not until after Cinda's charter was amended in 2004 that Cinda's primary purpose was the purchase and sale of nonperforming loans to customers in the ordinary course of business.

371. Cinda did not regularly purchase securities. Rather, Cinda acquired its nonperforming assets through only two government-mandated policy transfers— one from CCB and one from another state-owned bank, China Development Bank ("CDB")—in an effort to resolve China's banking crisis.

372. Cinda did not regularly sell to customers. Between 1999–2001 Cinda was focused on establishing its branch network office, reviewing its newly-acquired non-performing loan files, negotiating joint venture agreements with various foreign investors, and collecting for its own account via direct collections, litigation, government-mandated debt-for-equity swaps

and debt restructuring agreements. Cinda undertook all of these activities for its own account. Cinda did not announce a disposal plan that included sales of loan portfolios to third parties until November 2001.

373. Montgomery's 2002 due diligence revealed that Cinda did not receive any commissions or spreads and did nothing that would imply it was acting as a dealer.

374. Even if, by virtue of engaging in the various activities set forth above, Cinda could be considered a dealer in securities, Cinda falls within the "negligible sales" exception of 26 U.S.C. § 475. Under this provision, Cinda is not a dealer if the total adjusted basis of the loans it sold was less than 5 percent of the total basis, immediately after acquisition, of the debt instruments that it acquired each year preceding the transfer of NPLs to Southgate. Here, there is no evidence that Cinda sold a single non-performing loan portfolio to a third party through the end of 2001. The lone portfolio "sale" referenced by the Government's expert—a 2001 transaction involving Chenery Associates ("Chenery")—was not a sale of loans, but rather a contribution of loans to a partnership.

375. Professor Yang opined that Cinda was a dealer in securities "by definition" from its inception "based on ... three official documents in China": 1) the State Council's approval for the establishment of Cinda in 1999; 2) the State Council's AMC Regulations, and; 3) Cinda's charter, approved by the People's Bank of China. Yang posits that these three documents set forth a range of activities in which Cinda could engage: "one, purchase of NPLs and sale of ... NPLs, or the transfer of NPLs.... And two, Cinda could do debt-for-equity swaps. And three, Cinda could underwrite securities."

376. Yet the question of whether Cinda was a dealer in securities or not does not

turn on whether Cinda was capable of buying and selling securities. While Cinda could have engaged in a wide array of activities between 1999 and 2001, the evidence shows that Cinda did not buy or sell loans in the regular course of its business during that period.

377. Professor Yang stated that he performed an analysis of Cinda's specific activities between 1999–2001, which, he contends, demonstrates that under either a facts-and-circumstances or a mathematical approach, Cinda operated as a dealer. Yang concedes that he had no access to what would have been the best evidence to inform such an analysis—Cinda's own books and records. Many of the sources on which Yang relied in lieu of Cinda's records—an assortment of articles, website postings, anecdotal evidence, and student research papers—provide relatively vague information about Cinda's dealings.

378. Plaintiff raises legitimate questions about Professor Yang's factual analysis. For example, Yang contends, based upon a 2000 International Financing Review Asia article, that Cinda "sold" thirty-eight loans at auction in 2000. The article, however, merely states that bidding had taken place, not that any assets actually were sold, and Yang did not verify that a sale had in fact occurred. Yang concedes that the article may have been discussing an auction of collateral underlying a non-performing loan as opposed to a non-performing loan itself.

379. Yang also opines that Cinda's regular activities as a dealer included securities underwriting, which he defined as an investment banking firm selling stocks on behalf of a client. Yet Yang cited only two instances in which Cinda engaged in underwriting between 1999 and August 2002: a December 2000 initial public offering by the Hongxing Iron and Steel Corporation and the May 2002 establishment of the Zhengzhou Textile Machinery Corporation.

He admits that he knows little about the specifics of either transaction, including whether or not Cinda simply received a fee for its best efforts to assist the issuer—in which case Cinda would neither have purchased nor sold securities.

380. Yang testified that three joint ventures entered into between Cinda and foreign financial institutions were "important" evidence of Cinda's dealer status. Yang concedes that he has "no idea" whether two of the three joint ventures ever closed, and he does not know the purpose of the third joint venture.

381. Yang found sources that gave conflicting values for the non-performing loan portfolio Chenery acquired from Cinda in 2001. Because he could not rule out that his sources referred to the same transaction, Yang's report lists the same Chenery deal as two separate transactions. Yang cites an article authored by Ted Osborn as support for one of the two Chenery entries in his report. Osborn confirmed that the value included in his article is incorrect and that there was only one Chenery–Cinda transaction in 2001. Such inexactness was the hallmark of Yang's results-oriented approach, in which nearly anything and everything Cinda did between 1999–2001 made Cinda a "dealer," and any and all sources of information could be used to demonstrate that conclusion.

382. The Court does not accept Professor Yang's contention that Cinda sold enough loans to exceed the negligible sales threshold of 26 U.S.C. § 475. Yang appears to have considered almost any kind of transaction to be a "sale": debt restructurings, direct collections, sales or leases of real property and other collateral, litigation, and, most significantly, government-mandated debt-for-equity swaps. Debt-for-equity swaps account for the vast majority of Cinda's so-called sales identified in Yang's report.

383. Yang concedes that engaging in certain activities—specifically, direct collections and acquiring or disposing of assets through litigation—would not qualify Cinda as a dealer and should not have been included in his "sales" calculations. Yet Yang admitted that he had in fact included such loan dispositions as sales in his report. Other transactions apparently erroneously counted as sales in Professor Yang's computations include: (i) debt restructurings, (ii) sales of underlying collateral collected through legal proceedings, and (iii) settlements of loans for less than face value (which Yang seems to have included as if they were resolved for their full value).

384. Yang's counts as sales debt-for-equity swaps—in which Cinda converted debt it held into equity as a means of recovering some value on a loan—even though they appear to constitute a form of Cinda collecting for its own account from its borrowers rather than engaging in a "sale" to a "customer." The targets of the swaps were instead the borrowers whose participation in the debt-equity exchanges was designated by the Chinese government as part of a broad effort to reorganize as many viable SOEs as possible.

385. The non-performing loans that were the subject of the debt-for-equity swaps engaged in by Cinda through 2001 were not securities being held for sale to customers. Experts for both parties concur that the swaps at issue were policy-oriented exchanges designated by the Chinese government, rather than commercial transactions. Cinda could not freely dispose of the shares it acquired through these government-mandated debt-for-equity swaps. Chinese law restricted Cinda's ability to sell its shares to third-parties or to list them on a stock exchange, and in the vast majority of cases, the debtor either had the contractual ability or was required to buy back the shares that had

been transferred to Cinda. Through 2001, Cinda did not sell any equity interests it received through these swaps to third parties; Cinda's first successful sale to a third party of an asset it obtained through a debt-equity swap took place in October 2002.

386. Excluding debt-for-equity swaps and other non-sales transactions from the calculation, the Court finds that between 1999–2001, Cinda did not sell a sufficient number of assets to be considered a dealer in securities.

387. These findings as to Cinda's dealer status comport with the representations made by Cinda in the Contribution Agreement to Southgate. Cinda warranted that:

> In each fiscal year during which [Eastgate or Cinda] has held the Debt Portfolio, the total adjusted basis of debt instruments (or parts of debt instruments), sold, transferred or exchanged by [Eastgate or Cinda] … has been less than five percent (5%) of the total basis, immediately after acquisition, of all debt instruments acquired (regardless how acquired) by [Eastgate or Cinda] … in that year.

> In each fiscal year during which [Eastgate or Cinda] has held the Debt Portfolio, [neither Eastgate nor Cinda] has not purchased or sold any securities (including but not limited to corporate stock; interests in widely held or publicly traded partnerships or trusts; notes, bonds, debentures or other evidences of indebtedness; interest rate, currency or equity notional principal contracts; evidences of an interest in any of the foregoing or any currency, including any option, forward contract, short position, and any similar financial instrument; and any hedge with respect to the foregoing) from or to customers in the ordinary course of business.

388. Cinda represented that it had "never accounted for the [NPLs] as inventory," and that it had "not filed any election with the U.S. Internal Revenue Service to be treated as a dealer with respect to" the NPLs.

389. Sinobridge and Haiwen both confirmed Cinda's representations to Southgate.

390. Osborn testified that it was reasonable for Southgate to rely on Cinda's representations in the Contribution Agreement because in his experience, a Chinese state-owned enterprise, and particularly an AMC, would take representations in an agreement seriously and make sure such representations were accurate. Ling confirmed that Chinese law could subject Cinda to criminal penalties if it made fraudulent representations in the Contribution Agreement.

### iii. Section 482

391. In the FPAA, the IRS articulated the theory that, even if Southgate's losses were otherwise allowable, "under the authority of Section 482" "the entire loss should be allocated to China Cinda and not to [Beal]." Although the IRS allegedly was moving the losses associated with the NPLs from Beal to Cinda, no Government witness asserted that position again.

392. On August 22, 2007, less than one year after the IRS issued the FPAA, the Department Of Justice ("DOJ"), on behalf of the IRS, answered interrogatories issued by Southgate. In response to an interrogatory seeking legal theories and factual support for certain contentions in the FPAA, the DOJ made the following statement regarding § 482:

> Congress has authorized the Internal Revenue Service to adjust the price paid by Cinda downward, to an amount equaling the true fair market value of the Chinese Loans when Cinda acquired them, "in order to prevent evasion of

taxes or clearly to reflect the income" of Southgate, and Beal, upon any subsequent disposition of the Chinese loans by Southgate. 26 U.S.C. § 482.

The United States contends that the § 482 adjustment required in this case reduces Cinda's adjusted basis, and that of Southgate, in the Chinese Loans to an amount approximately $20 million, Beal's true economic investment in the Chinese Loans, thus conforming any loss deduction allowable for federal income tax purposes to the true economic loss, if any, incurred by Beal and Southgate.

393. This interrogatory answer, which differs materially from the position set forth by the IRS in the FPAA, was verified by DOJ counsel, not by an IRS representative. Nowhere in the interrogatory responses does the DOJ address the Section 482 theory articulated in the FPAA. The Government did not posit the Section 482 theory asserted at trial until after the issuance of the FPAA and after the litigation had begun.

394. On October 3, 2008—after the close of both expert and fact discovery—the IRS, through a 30(b)(6) deposition witness, re-confirmed that "[Section 482 was] no longer ... being considered by the Government as a contention...." At this deposition, however, the IRS witness, in response to questions from DOJ trial counsel, advised for the first time that the IRS had "recently ... authorized" the DOJ to assert the Section 482 argument set forth in the DOJ's interrogatory responses.

395. Moving to the substance of the Government's Section 482 argument, the Court finds that Southgate was not controlled by Cinda, CCB or the Chinese government. The Government does not allege, and there was no proof offered at trial to suggest, otherwise.

396. The Court also finds that neither Cinda nor CCB is a United States taxpay-

er or that either entity has misallocated income for purposes of United States tax law. Again, the Government has never made such an allegation and no proof was adduced at trial suggesting otherwise.

397. The Court finds that Cinda and CCB were not commonly controlled.

398. The parties generally did not contest the facts underlying the issue of common control, only the conclusions drawn from those facts. As explained by Professor Donald Lewis ("Lewis"), Plaintiffs expert on Chinese legal matters, as a matter of Chinese law, Cinda and CCB are both "enterprise legal persons" under Chinese law, which means that they have independent personalities, their own organizations, their own premises, and they are able to sue and be sued independently. Cinda is likewise an LLC under Chinese law.

399. The parties agree that Cinda and CCB are wholly state-owned companies and that myriad branches of the Chinese government have oversight and regulatory roles related to Cinda and CCB. Although both Cinda and CCB are wholly state-owned, there is a sufficient "bright line" between state ownership and enterprise management. As such, both Cinda and CCB are entitled to treat their property or assets as their own and not that of the state.

400. The Chinese government does not "control," i.e., direct the management decisions of, Cinda or CCB because (a) the entities are separate "enterprise legal persons" with control over their own assets and property; (b) they do not share management; (c) they have separate management structures, with separate and presidents or governors; (d) they have separate "supervisory boards"; (e) they are subject to a wide and different range of regulatory and supervisory influences, but they are not under the supervision of any single regulatory or governmental entity; and (f)

they are different entities—an AMC and a bank—with different scopes of business.

401. Based on the foregoing, the Court finds that although in the broad sense of a communist-controlled state all entities are government owned, for purposes of this tax question the separation is sufficient, as with General Motors in this country, to make Cinda not controlled by the Chinese government. The parties have also stipulated that at no time could MCA, Southgate, or Beal control Cinda's actions.

## V. Expert Witnesses

402. The Court finds the experts proffered by the parties qualified to offer expert testimony in this case. The Court's assessment of their credibility is reflected in these findings and conclusions.

## II. Conclusions of Law

Prior to filing their petitions in this court and in accordance with 26 U.S.C. § 6226(e)(1), Plaintiff deposited with the Internal Revenue Service the amount by which tax liability would be increased if the partnership items were made consistent with the adjustments by the FPAA. The Court thus determines it has jurisdiction over this matter pursuant to Sections 6226(b) and (e), and 28 U.S.C. § 1346(e).

This case is governed by the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Sections 6221–6233, which was enacted to "improve auditing and adjustments of income tax items attributable to partnerships." *Alexander v. United States*, 44 F.3d 328, 330 (5th Cir.1995).

TEFRA sets forth the Court's jurisdiction to review adjustments to a partnership return. Under TEFRA, the tax treatment of any "partnership item" and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item must be determined in a single proceeding at

the partnership level. 26 U.S.C. § 6221; *Weiner v. United States,* 389 F.3d 152, 154 (5th Cir.2004). Although TEFRA defines a "partnership item" in technical terms, the provision generally encompasses items "more appropriately determined at the partnership level than at the partner level." *Id.* § 6231(a)(3). Furthermore, the Court's jurisdiction in a TEFRA proceeding is limited by Section 6226(f), which provides:

A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which related to an adjustment to a partnership item.

*Id.* § 6226(f).

The Code does not grant the district court jurisdiction to order a refund in a readjustment action brought pursuant to Section 6226. *Klamath Strategic Inv. Fund v. United States,* 568 F.3d 537, 552 (5th Cir.2009). Accordingly, the Court limits its analysis to partnership items for Southgate in 2002, the proper allocation of such items, and the applicability of any penalty, addition to tax, or additional amount which related to an adjustment to a partnership item. *See id.* (defining district courts' jurisdictional limits under 26 U.S.C. § 6226(f)). Given the complexity of the argument, the length of trial, and the voluminous submissions in this case, the Court will attempt to narrow its analysis to address those issues bearing directly on the ultimate outcome.

Beal claims this case arises from an IRS attempt to recast a genuine, multi-party investment in Chinese distressed assets as an abusive "tax shelter." The transaction at issue, Plaintiff argues, was entered into by an experienced investor in distressed assets who was seeking to profit from a partnership that owned distressed Chinese debt. According to Plaintiff, the transaction was structured to optimize the tax consequences of the investment, consistent with the Internal Revenue Code and regulations.

The Government contends that Beal and his agents engaged in an abusive tax shelter, referred to by the IRS as a distressed asset/debt ("DAD") transaction. This DAD tax shelter, the Government argues, was designed to shift to Beal the supposed tax benefits associated with losses on the Chinese NPLs that actually were incurred by an arm of the Chinese government. In effect, the Government argues, Beal is trying to import a loss suffered by the Chinese government for use on his U.S. tax return.

### A. Burden of Proof

Absent an agreement or a determination that there has been a shift of the burden of proof to the government under 26 U.S.C. § 7491, the general rule is that the taxpayer bears the ultimate burden of proof in tax cases. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Woodall v. Comm'r,* 964 F.2d 361, 363 (5th Cir.1992) ("A taxpayer challenging the IRS's disallowance of a deduction bears the burden of proof."). It is well settled that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. Comm'r,* 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992) (quoting *Interstate Transit Lines v. Comm'r,* 319 U.S. 590, 593, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943)).

Section 7491 shifts the burden of proof to the Government on any factual issue relevant to ascertaining the liability of a

taxpayer if the taxpayer: (1) **introduces credible evidence on disputed facts; (2) complies with the Internal Revenue Code's substantiation and record maintenance requirements; (3) cooperates with reasonable requests from the IRS for witnesses, information, documents, meetings, and interviews; and (4) in the case of a partnership, has a net worth below $7 million on the date suit is filed.** 26 U.S.C. § 7491(a) (emphasis added). Congress imposed the burden on the taxpayer of establishing that these four requirements of Section 7491(a)(2) have been met. *See* S. REP. No. 105–174, at 45 (1998) ("The taxpayer has the burden of proving that it meets each of these conditions, because they are necessary prerequisites to establishing that the burden of proof is on the Secretary."). The burden of proof does not shift on any matters the Court concludes are legal matters rather than factual issues. *Jade Trading, LLC v. United States,* 80 Fed.Cl. 11, 47 (2007).

### i. Plaintiff's Credible Evidence on Disputed Facts

The legislative history of Section 7491 defines "credible evidence" as "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." S. REP. No. 105–174, 1998 WL 197371, at *45. Additionally, "[a] taxpayer has not produced credible evidence for these purposes if the taxpayer merely makes implausible factual assertions, frivolous claims, or tax protestor-type arguments. The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief." *Id.* at *45–46.

As evidenced by the sheer number of factual findings made by the Court in this case, both sides have offered substantial evidence to support their respective posi-

tions. The purpose behind the requirement is to weed out frivolous claims. The Court concludes it could base a decision on the material issues in dispute solely upon evidence presented by Plaintiff and is therefore satisfied that Plaintiff offered credible evidence to meet its requirement under Section 7491.

### ii. Plaintiff's Compliance with Code Requirements

To meet the Internal Revenue Code's substantiation and record maintenance requirements, Plaintiff must (1) substantiate its losses and (2) maintain adequate books and records. 26 U.S.C. § 7491(a)(2). To substantiate losses, taxpayers must come forward with evidence supporting the items of income, deduction and credit reported on their returns—tax returns are not enough. *Wilkinson v. Comm'r,* 71 T.C. 633, 639, 1979 WL 3854 (1979). Thus to meet this requirement, a taxpayer must present "evidence, such as business records, building deeds, testimony by customers or business partners, and so on." *In re Indus. Comm. Elec., Inc.,* 319 B.R. 35, 55 (D.Mass.2005).

"Substantiation requirements include any requirement of the Code or regulations that the taxpayer establish an item to the satisfaction of the Secretary." S. REP. No. 105–174, 1998 WL 197371, at *46. The Government contends that Plaintiff failed to meet this burden because it failed to introduce evidence establishing the NPLs were not worthless by the time they were transferred to Southgate. Plaintiff failed to show Cinda had not written off any of the NPLs, the terms on which Cinda acquired the NPLs, and failed to present a witness with personal knowledge of these matters at trial. Despite this contention, the Government does not point to any specific "requirement of the Code or regulations" that Southgate has failed to sub-

stantiate by providing evidence supporting the items of income, deduction, and credit reported on the returns in question. Given the evidence presented by Plaintiff and the fact that witnesses from Cinda are beyond the subpoena power of this Court, this Court concludes that Southgate has carried its burden of substantiation, at least for purposes of Section 7491. The Government does not challenge the adequacy of Southgate's bookkeeping, even if the substantive matters contained therein remain disputed.

### iii. Plaintiff's Cooperation with the IRS

Plaintiff's third enumerated requirement under Section 7491 is to cooperate with the IRS for witnesses, information, documents, meetings, and interviews. The requests must be reasonable:

> [P]roviding, within a reasonable period of time, access to and inspection of witnesses, information, and documents within the control of the taxpayer, as reasonably requested by the Secretary[.] Cooperation also includes providing reasonable assistance to the Secretary in obtaining access to and inspection of witnesses, information, or documents not within the control of the taxpayer (including any witnesses, information or documents located in foreign countries)
> . . . .

S. REP. No. 105–174, 1998 WL 197371, at *45.

The Government contends that Plaintiff did not cooperate because it failed disclosed the existence of more than one-thousand translated Chinese loan documents until shortly before trial despite two discovery requests by the United States for the documents.

It is apparent to the Court that the IRS took an aggressive posture very quickly, motivated at least in part by time pressures. Plaintiff responded with aggressive litigation tactics. Plaintiffs vigorous dispute of the amount due and subsequent litigation strategies do not undermine its contention that its cooperation met the standard of Section 7491, as the cooperation requirement applies to an IRS audit rather than discovery disputes in subsequent litigation. Plaintiff appears to have cooperated at great expense—both in terms of money and effort expended. Plaintiff produced many thousands of documents, provided its Chinese–to–English translations of many documents, arranged depositions, and complied with subpoenas. The Government did not introduce an English translation of a Chinese loan document, and did not demonstrate to the Court what use it would have made of additional English translations. The Government's sole expressed complaint, that it did not receive an additional one-thousand loan documents that played no role at trial, appears calculated only to defeat Plaintiff's assertion of cooperation. Thus, the Court finds Plaintiff's cooperation with the reasonable requests of the IRS satisfactory for purposes of the burden-shifting analysis.

### iv. The Partnership's Net Worth Met the Statutory Requirement

The final specification under the burden-shifting provision requires the partnership's net worth to be less than $7 million. 26 U.S.C. § 7491. The date of determination of the net worth of a partnership is the date of filing the petition or complaint. *See* 26 U.S.C. § 7430(c)(4)(D) and 28 U.S.C. § 2412(d)(2)(B); *see also Stieha v. Comm'r*, 89 T.C. 784, 786, 1987 WL 45302 (1987) (stating that net worth is tested on the date original petition is filed); Robert J. Stuart, *Taxpayer Procedures and Remedies in Tax Controversies*, 61 TAX LAW. 941, 945 (2008) ("Generally speaking, a taxpayer's net worth is tested on the date the litigation commences (for example, the pe-

tition or complaint date) for purposes of 'shifting the burden of proof.' ").

The Government does not dispute Southgate's assertion that its net worth was approximately $3.9 million when it filed this lawsuit on December 19, 2006. Instead, the Government contends that Southgate improperly manipulated its net worth through a $55 million distribution of GNMAs and cash to Beal on October 13, 2006. It asserts the $55 million must be included in Southgate's net worth figure, placing it well about the $7 million threshold.

The Government cites two cases, *Estate of Woll v. United States,* 44 F.3d 464 (7th Cir.1994) and *Miller v. United States,* 926 F.Supp. 642, 644–45 (N.D.Ohio 1996), in which courts held that assets in the taxpayer's control but distributed prior to filing suit, must be included for purposes of determining the taxpayer's net worth calculation under the attorney fee provision of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(2)(B), the same net worth provision § 7491(a)(2)(C) utilizes. In *Woll,* however, the Seventh Circuit "unique nature and purpose of estates," with the certainty that an estate's assets will dwindle over time, in "contrast to the vagarious ups and downs of individual and corporate wealth." *Woll,* 44 F.3d at 468, 469.

As noted in *Miller,* Congress's statement of purpose behind the EAJA was that the legislation would "serve as an 'equalizer' for those litigants who could otherwise not afford costs of litigation against the federal government." *Miller,* 926 F.Supp. at 644 (citing *National Truck Equip., v. Nat. Hwy. Traffic Safety Admin.,* 972 F.2d 669, 673 (6th Cir.1992)). "When [a litigant has] the economic power to pursue litigation against the government without being deterred by the costs, the congressional purposes of the EAJA are undermined by an award to [that litigant]." *National Truck,* 972 F.2d at 674.

The legislative history of the Internal Revenue Service Restructuring and Reform Act of 1998, containing the burden-shifting provision at issue in this case, appears to express the inverse concern: seeking to rein in the IRS rather than simply empowering private litigants. *See* H. REP. No. 105–599; *see also* 144 CONG. REC. S7722 (1998) (statement of Sen. Dodd) ("By shifting the burden of proof, this bill will require that the IRS prove its allegations with evidence. It will help ensure that the IRS exercises appropriate caution and consideration prior to commencing an enforcement action against any taxpayer.") (emphasis added). Although the very inclusion of a net worth requirement demonstrates some legislative concern with the relative economic power of litigants, the overarching goals of the two acts and the facts at hand are not similar enough to counsel strict reliance on the cases cited by the Government.

The Court concludes that Plaintiff meets the requirements under Section 7491(a) to shift the burden of proof to the Government and does not credit the Government's apparent equitable concerns and policy-based arguments. Therefore, Plaintiff's Motion to Shift Burden of Proof to Defendant Pursuant to 26 U.S.C. § 7491 (Doc. No. 124) is **GRANTED.**

In any event, the burden of proof in this case is not dispositive for either side. As the Government notes, "a shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie." *Blodgett v. Comm'r,* 394 F.3d 1030, 1039 (8th Cir.2005). The Court prior to trial told the sides to act when presenting their cases as if they each had the burden of proof at all times in this case. Based on the weight of the evidence, the Court finds no evidentiary ties and would rule the

same way regardless of the burden of proof on any particular issue.

## B. Section 704(c)

Plaintiff's claim is premised on the assertion that 26 U.S.C. § 704(c) ("Section 704(c)") and 26 C.F.R. § 1.704–3(a)(7) ("Treas.Reg. § 1.704–3(a)(7)") require that when a built-in loss is realized through the sale or other disposition of an asset, it should be allocated back to the contributing partner. In this case, Plaintiff argues, the roughly $292 million of built-in loss realized at the end of 2002 would normally be allocated to Cinda as the partner who contributed the NPLs to Southgate. But because Beal had purchased 90 percent of Cinda's interest in Southgate, Section 704(c) and Treas. Reg. § 1.704–3(a)(7) mandated that 90 percent of the built-in loss realized in 2002, or roughly $263.5 million, be allocated to Beal:

> If a contributing partner transfers a partnership interest, built-in gain or loss must be allocated to the transferee partner as it would have been allocated to the transferor partner. If the contributing partner transfers a portion of the partnership interest, the share of built-in gain or loss proportionate to the interest transferred must be allocated to the transferee partner.

26 C.F.R. § 1.704–3(a)(7). Plaintiff believes the legislative history of Section 704(c) shows that Congress in 1954 anticipated the type of tax result derived from the Southgate transaction: "This rule was adopted in the interest of simplification of the partnership provisions. While the treatment may result in possible detriment (or gain) to noncontributing partners, it should be noted that there will, in general, be a corresponding loss (or gain) to such partners upon sale on disposition of their interest in the partnership." H.R. REP. No. 83–1337, reprinted in 1954 U.S.C.C.A.N. 4017, 4363. Plaintiff points to Beal's losses in 2002, 2003, and 2004 and

subsequent claimed gains in later years. Thus, Plaintiff contends that Section 704(c) and Treas. Reg. 1.704–3(a)(7) actually mandate the tax treatment for Cinda's contribution of the NPLs to Southgate.

Congress amended 26 U.S.C. § 704(c) in the American Jobs Creation Act of 2004, P.L. 108–357. Plaintiff contends the 2004 amendments, which explicitly eliminated the tax treatment reported by Southgate, demonstrate that Southgate accurately reported its tax results under the law as it existed at the time the transactions took place in 2002. In enacting the amendments, applicable to partnerships after October 22, 2004, Congress sought to rein in partnership tax shelters:

> Any items of partnership income, gain, loss and deduction with respect to the contributed property are allocated among the partners to take into account any built-in gain or loss at the time of the contribution. IRC § 704(c)(1)(A). This rule is intended to prevent the transfer of built-in gain or loss from the contributing partner to the other partners by generally allocating items to the noncontributing partners based on the value of their contributions and by allocating to the contributing partner the remainder of each item, [footnote omitted] If the contributing partner transfers its partnership interest, the built-in gain or loss will be allocated to the transferee partner as it would have been allocated to the contributing partner. Treas. Reg. § 1.704–3(a)(7).
>
> . . .
>
> The Committee believes that the partnership rules currently allow for the inappropriate transfer of losses among partners. This has allowed partnerships to be created and used to aid tax-shelter transactions. The bill limits the ability to transfer losses among partners, while

preserving the simplification aspects of the current partnership rules for transactions involving smaller amounts.

H.R. REP.NO. 108–578(1), 2004 WL 1380512, at *281–83 (2004). Plaintiff asserts this recognition by Congress amounts to an implicit acknowledgment that transactions like Southgate were appropriate under then-existing law.

It is just as likely, however, that Congress was trying to close a loophole that never really existed: "the partnership rules currently allow for the *inappropriate* transfer of losses among partners." *Id.* (emphasis added). The Government notes that the amendment changed Section 704 to require the allocation of built-in losses to the contributing partner rather than other partners. In doing so, Congress may have simply clarified its intention of preventing inappropriate transfers, something it intended even prior to 2004.

The Government further contends the Court may apply the so-called judicial doctrines or other provisions of the Code to reject deductions in the face of an abusive tax shelter despite Plaintiff's argument that Beal was "permitted" or "required" to take the challenged deductions by then-existing statute. For its proposition, the Government cites *Winn–Dixie v. Comm'r*, 254 F.3d 1313, 1316 (11th Cir.2001), which rejected deductions arising from company-owned life insurance shelter even though Congress did not change the law to take away those deductions until after the taxpayer had engaged in the transaction. *Accord BB&T Corp. v. United States*, 523 F.3d 461, 465 (4th Cir.2008) (rejecting claimed deductions for lease-in-lease-out shelter even though transaction predated Revenue Ruling eliminating the tax benefits for such transactions); *AWG Leasing Trust v. United States*, 592 F.Supp.2d 953, 959–60 (N.D.Ohio 2008) (rejecting deductions for sale-in-lease-out shelter even though transaction closed before Congress eliminated tax benefits for such transactions).

As the Supreme Court has held, "attribut[ing] to Congress a purpose to allow the deduction" of transactions made before such a remedial amendment, when the challenged transaction is a sham, "would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." *Knetsch v. United States*, 364 U.S. 361, 367, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960) (citation and internal quotations omitted). Although Plaintiff appears to have relied on a literal interpretation of the statutory language as it existed prior to the 2004 amendments, the Court is unwilling to attribute to Congress a motive it did not clearly express. Following other decisions, the Court further concludes that Plaintiff's claimed compliance with statutory language does not preclude it from applying the judicial doctrines to the transaction in question. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1343 (Fed.Cir.2006) (applying the economic substance doctrine even though the plaintiff's "claimed capital loss fell within the literal terms of the statute").

### C. Judicial Doctrines

 The Government contends that even if the Southgate transaction arguably facially complied with the plain text of 26 U.S.C. § 704(c) as it existed at the time, the abusive nature of this transaction requires the Court to reject Southgate's claimed tax benefits under the judicial doctrines of economic substance, sham partnership, and substance over form.

### i. Economic Substance

 The economic substance doctrine allows courts to enforce the legislative purpose of the Internal Revenue Code by preventing taxpayers from reaping tax

benefits from transactions lacking in economic reality. *Klamath,* 568 F.3d at 543 (citing *Coltec,* 454 F.3d at 1353–54). Taxpayers undoubtedly have the right to decrease or avoid taxes by legally permissible means. *See Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935). "The doctrine of economic substance becomes applicable, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings". *Yosha v. Comm'r,* 861 F.2d 494, 498–99 (7th Cir.1988). The application of this well-established doctrine is nevertheless murky: "The casebooks are glutted with [economic substance] tests. Many such tests proliferate because they give the comforting illusion of consistency and precision. They often obscure rather than clarify." *Collins v. Comm'r,* 857 F.2d 1383, 1385 (9th Cir.1988).

The Supreme Court has held that "[w]here … there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon Co. v. United States,* 435 U.S. 561, 583–84, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). "Importantly, these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes." *Klamath,* 568 F.3d at 544. Thus, the Fifth Circuit requires a taxpayer to establish both that the transaction had a reasonable possibility of profit (the so-called "objective" economic substance test) and the taxpayer was motivated to enter into the transaction for a legitimate non-tax business purpose (the so-called "subjective" test).

"[W]hen applying the economic substance doctrine, the proper focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions that do not produce tax benefits." *Id.* at 545. Thus, "transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." *Higgins v. Smith,* 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406 (1940). Yet in applying these principles, a court must view the transactions "as a whole, and each step, from the commencement … to the consummation … is relevant." *Weller v. Comm'r,* 270 F.2d 294, 297 (3d Cir.1959); *accord Comm'r v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945).

Courts should not "reward a 'head in the sand' defense where taxpayers can profess a profit motive but agree to a scheme structured and controlled by parties with the sole purpose of achieving tax benefits for them." *Klamath,* 568 F.3d at 544–45 (adopting the majority view "that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance") (citing *Coltec,* 454 F.3d at 1355; *United Parcel Serv. of Am., Inc. v. Comm'r,* 254 F.3d 1014, 1018 (11th Cir. 2001); *ACM Partnership v. Comm'r,* 157 F.3d 231, 247 (3d Cir.1998); *James v. Comm'r,* 899 F.2d 905, 908–09 (10th Cir. 1990)). The profit motive of a partnership is determined at the partnership level. *Klamath,* 568 F.3d at 550.

The Government alleges that the Southgate transaction lacked any reasonable expectation of profit and instead was established to shelter more than $1 billion of Beal's ordinary income. "In reality, all Beal did was purchase an essentially worthless portfolio of loans for $19 million and that is how the transaction should be taxed." Gov't Br. 18. This alleged abu-

sive tax scheme was designed only to give Beal a 50:1 tax write-off, the Government contends.

Plaintiff responds that Southgate was a genuine business deal entered into by experienced investors seeking a profit, as they had in past deals. Plaintiff presented substantial evidence that "nuggets" of value found within a pool of NPLs can be enough to generate profit if the price paid for the NPLs is sufficiently low. Plaintiff cites the Zhongyu valuation report for the proposition that the NPLs' value was between $45 million and $112 million. Plaintiff further contends that the Government, by conceding in its arguments regarding the valuation misstatement penalties that at least some of Southgate's losses are deductible, necessarily concedes that the transactions at issue had economic substance.

It is apparent to the Court that the transaction in question here must be divided for purposes of economic substance analysis. The first step requires the Court to examine the economic substance of the partnership between Cinda, MCA, and Beal in the Southgate LLC acquisition of the Chinese NPLs. The second, underlying transaction—the one that built Beal's basis in Southgate through Martel—must undergo similar analysis.

### a. Southgate Itself had Economic Substance

Taking the *Frank Lyon* factors in turn, the Court concludes that the Southgate transaction regarding the Chinese NPLs (1) had economic substance compelled by business or regulatory realities, (2) was imbued with tax-independent considerations, and (3) was not shaped totally by tax-avoidance features. *See Frank Lyon,* 435 U.S. at 583–84, 98 S.Ct. 1291; *Klamath,* 568 F.3d at 544. As the Court has found, the Southgate transaction had a very reasonable expectation of profit.

Other entities, including Goldman Sachs, Morgan Stanley, Merrill Lynch, and Lehman Brothers, had profitable ventures in the Chinese NPL market. Plaintiff's experts testified, and the Court agrees, that the possibility of profit existed. The Court agrees that such subjective expectation must be measured at the time of the transaction rather than with 20/20 hindsight. *See Smith v. Comm'r,* 937 F.2d 1089, 1096 (6th Cir.1991) ("It is crucial, moreover, that this [profit motive] inquiry be conducted from the vantage point of the taxpayer at the time the transactions occurred, rather than with the benefit of hindsight."). The Government's attack on Southgate's due diligence is unconvincing. These were low-caliber loans sold for pennies on the dollar. Thorough investigation of the loans, at great expense, would have eliminated much profit potential and would have slowed this relatively time-sensitive transaction. Although it is apparent that the deal made no profit, the credible testimony at trial convinced the Court that Plaintiff moved quickly to secure the deal and expected collections on the NPLs to return at least some profit.

The text of Section § 704(c) as it existed prior to 2004 arguably encouraged these types of transactions because of the regulatory scheme authored by Congress. And because Plaintiff saw a profit potential, the Court cannot conclude the transaction was shaped *solely* by tax-avoidance features. Although the deal appears structured to capture *both* profit as it is traditionally understood and any potential tax savings—Beal wanted to have his cake and eat it too—such deals do not automatically offend the economic substance doctrine.

Yet as the Court concludes, the transactions underlying the Southgate transaction do not satisfy the full range of judicial doctrines.

### b. The Martel Restructure/GNMA Repo Transaction Underlying Southgate had No Economic Substance

For Beal to take $216 million in losses from Southgate on his 2002 individual return, he must prove a sufficient outside basis in Southgate to claim the losses under Section 704(d). On December 27, 2002, Beal engaged in several transactions (the "Martel Restructure/GNMA Repo transaction") in an effort to increase his outside basis in Southgate. Because the Martel Restructure had no discernible economic substance, the Government asserts it must be disregarded.

Plaintiff responds that Southgate, rather than Beal, owned GNMAs worth approximately $180 million, and all of Southgate's partners could share in any increases or decreases in the fair market value of the GNMAs. Thus, Plaintiff contends, Beal contributed the opportunity for gains through the market fluctuation of the GNMAs and at least some economic substance existed. Montgomery testified that the tax-independent business purposes for the GNMA transaction included: (1) reducing Beal Bank's interest rate risk; (2) allowing Southgate's other partners to share in the gains and losses on the GNMAs; and (3) and building Southgate's equity base.

Here, as the Government correctly asserts, the Chinese NPL transaction via Southgate and the Martel/GNMA Repo transaction were both necessary for Beal to claim the tax benefit. Thus the economic substance doctrine applies to both.

Objectively, the GNMA/Martel transaction lacks economic substance because Southgate did not have a reasonable possibility of profit from it, despite the opportunity for profit from the original NPL transaction. Before transferring Martel to Southgate, Beal effectively reserved for himself all guaranteed income streams from the GNMAs and sole discretion to award gains or losses from the securities to the partnership. The possibility of Beal exercising his option to allow Southgate to profit from the GNMA transaction—effectively to his own economic detriment—was not a reasonable possibility of profit for Southgate.

Subjectively, Plaintiff at trial did not establish any valid business purpose for this "basis-build" transaction other than the tax benefits obtained by Beal. The proffered reasons for the deal read like afterthoughts designed to disguise the true purpose. Reducing the interest rate exposure of a third party, Beal Bank, was not a valid consideration for Southgate or Martel. It is further apparent that Beal never intended to share any potential gains or losses from the GNMAs with the other partners in Southgate. And Plaintiff's contention that the deal increased Southgate's equity base to pursue other NPL deals in China is belied by the fact that Beal created other similar entities similar to Southgate (Southbrook Master Fund, LLC, Classic Paragon, LLC, and Pinnacle Management, LLC) to pursue other Chinese NPL deals, which could not take advantage of any increased equity in Southgate. Thus, the Martel/GNMA Repo transaction underlying Southgate fails the test set forth in *Frank Lyon* and *Klamath*.

As the Federal Circuit concluded in *Coltec*, "although [Plaintiff's] claimed capital loss fell within the literal terms of the statute, the transaction that created the high basis in the stock lacked economic substance and therefore must be disregarded for tax purposes." 454 F.3d at 1343. The *Coltec* decision is representative of the majority view adopted by the Fifth Circuit in *Klamath*. 568 F.3d at 543–44. Accordingly, the Court must conclude that because the transaction that created Beal's high basis lacked economic

substance it must be disregarded for tax purposes. Thus, the economic substance test is fatal for the Martel/GNMA Repo transactions underlying Southgate and compels the Court's conclusion that the transactions—taken as an appropriate whole—lacked economic substance. The Government properly disregarded this transaction in calculating Beal's basis.

### ii. Sham Partnership

The Government additionally contends that Southgate Master Fund, LLC was a "sham" partnership and should therefore be disregarded. As the Government notes, a taxpayer's selection of the partnership form to conduct business is not automatically respected for tax purposes, even if the underlying activity was a genuine business activity. Rather, such a partnership should be respected only if "the partners really and truly intended to join together for the purpose of carrying on the business and sharing in the profits and losses or both." *Comm'r v. Culbertson*, 337 U.S. 733, 741, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949)

This sham partnership doctrine is a kissing cousin to the economic substance/sham transaction inquiry: "Courts ... compare the transaction in question with transactions that might usually be expected to occur in bona fide business settings." *Merryman v. Comm'r*, 873 F.2d 879, 881 (5th Cir.1989). Yet, "[t]he existence of a tax benefit from a transaction does not automatically mean it is a sham so long as it is imbued with tax-independent considerations." *Id.* (citing *Holladay v. Comm'r*, 649 F.2d 1176, 1179 (5th Cir.1981)).

Thus, as Plaintiff notes, the mere fact that Southgate afforded tax benefits to Beal does not make the Southgate LLC a sham. Plaintiff contends that "Southgate was a real partnership with real partners who contributed real capital, was imbued with real business purposes, and presented a real possibility of profiting on the NPLs." Pl.'s Br. 21.

The Government contends that none of those statements are true. Instead, the Government states, Southgate was a sham partnership under Fifth Circuit law, exemplified by *Merryman*, because it had no economic substance or any purpose apart from creating tax benefits. Further, it believes the Court should disregard Southgate as a sham partnership for tax purposes even if it finds the transaction had economic substance. The Government cites Montgomery's testimony acknowledging that either Beal or Martel could have purchased the Southgate NPL Portfolio directly without using such a structure. And the Government notes that De Castro advised Beal and Montgomery that Beal had to join a preexisting partnership structure to be able to generate a large tax loss on the Chinese NPLs that Beal could claim on his personal tax returns.

The Government cites the partnership anti-abuse regulation, Treas. Reg. § 1.701–2, as additional support for disregarding the Southgate partnership as a sham. The parties agree the Court does not need to reach this regulation, which Plaintiff contends is inapplicable or invalid, if it finds the partnership lacked economic substance or is a sham under the judicial doctrines.

Plaintiff distinguishes *Merryman* on several fronts. In that closely held family oil company formed a shadow partnership of the parties' existing business relationship with its shareholders and certain executives. *Merryman*, 873 F.2d at 880. The entire capital contribution to the partnership was $1,000. *Id.* As its sole business, the partnership bought an oil rig from the family company and hired the family company to run it. While there were payments that were supposed to flow between the family company and the partnership, they did so irregularly, if at all.

The partnership dissolved little more than six months after it was formed. *Id.*

Conversely, Plaintiff contends, the tax-independent considerations in forming Southgate are many: it minimized the onerous legal and regulatory impediments to relating a wholly owned foreign entity in China; Montgomery was able to align Cinda's economic interests with those of the LLC; the Southgate structure allowed Montgomery to "lock down" particular NPLs as Southgate's future property early in the process, before Cinda had the opportunity to cull choice loans from the pool; and having Cinda as a partner enabled Southgate to exercise Cinda's "super powers" with respect to borrowers. Plaintiff further notes that Southgate, as a limited liability company rather than a partnership, renders Beal's control irrelevant as it was no different than that of any majority interest holder in a similar business association.

Thus, Plaintiff asserts that the contribution of the GNMAs accomplished significant tax-independent business purposes independent of objective economic substance. Plaintiff asserts: the contribution of the GNMAs to Southgate diversified its debt portfolio because there was no expected correlation in the values of United States residential mortgages and Chinese non-performing business loans; the contribution resulted in $18,558,175 of additional net equity contributed to Southgate; the funds could then be used to further Beal's and Montgomery's goal of using Southgate as a platform for other Chinese business; and the additional capital contribution was used by Montgomery in negotiations with Huarong AMC to establish that Southgate and its principals were serious investors in Chinese non-performing loans. Additionally, Plaintiff states, from Beal's perspective, the contribution of $18 million in net equity increased his capital account, and therefore, share of the profit percentage, and the contribution of the repo loan proceeds to Beal Bank decreased its interest rate risk from the GNMAs.

Despite Plaintiff's attempts to imbue the partnership with legitimacy, the Court must conclude it was a sham. Although the Southgate transaction was not a sham per se, it is apparent to the Court that the underlying Martel/GNMA Repo structure was nothing more than a sham to gain tax benefits for Beal. As the Court has found, there was no substantive non-tax economic reason for Beal to transfer Martel and the GNMA repo transaction to Southgate in the December 31, 2002, restructuring transaction. Beal relinquished nothing of economic value, and Southgate and its members other than Beal received little of economic value. Beal never exercised his option to share any gains from the GNMAs with Southgate's other members, Cinda and MCA. Southgate allocated all income from the GNMAs to Beal, and never recorded any allocation of income from the GNMAs to MCA or Cinda. Southgate would only realize gains or losses from the GNMA securities if Martel sold the GNMAs. The profit was thus illusory because Beal retained total control over any transactions that Martel could execute regarding the GNMAs, including any transaction that could generate a gain. The Second Amendment to the Southgate Operating Agreement also granted Beal the unqualified option to direct Martel to distribute the GNMA securities to himself, without Southgate incurring any obligation to make any distributions to its other members. Taken together, it is apparent that the Martel/GNMA Repo transaction resulted in a sham partnership, and Beal therefore is not entitled to an increase in his outside basis.

### iii. Substance over Form

"The fundamental premise underlying the Internal Revenue Code is that taxation

is based upon a transaction's substance rather than its form." *Freytag v. Comm'r,* 904 F.2d 1011, 1015 (5th Cir.1990). Courts may recharacterize transactions to conform with economic reality and reject the claimed tax benefits because they arise from a form that does not conform with economic reality. *See, e.g., Nebraska Dep't of Revenue v. Loewenstein,* 513 U.S. 123, 115 S.Ct. 557, 130 L.Ed.2d 470 (1994) (recharacterizing purported "sale" and "repurchase" of municipal bonds as a secured lending transaction); *TIFD III–E, Inc. v. United States,* 459 F.3d 220 (2d Cir.2006) (recharacterizing purported equity stake in partnership as repayment of debt); *Kuper v. Comm'r,* 533 F.2d 152, 154 (5th Cir. 1976) (recharacterizing purported nontaxable contribution of stock as taxable exchange and dividend).

Although some of the decisions date back decades, the Fifth Circuit has repeatedly determined that intermediaries inserted into a transaction for the purpose of altering tax consequences should be disregarded. *See Davant v. Comm'r,* 366 F.2d 874 (5th Cir.1966); *Blueberry Land Co. v. Comm'r,* 361 F.2d 93 (5th Cir.1966); *Reef Corp. v. Comm'r,* 368 F.2d 125 (5th Cir.1966). In these cases, the court analyzed whether the form of the transaction reflected its true substance, and whether the form effectuated—or thwarted—Congress' intent underlying the relevant tax provisions at issue. The Fifth Circuit examined the practical effect of all the steps taken by the parties and emphasized that "courts have never been shackled to mere paper subterfuges." *Davant,* 366 F.2d at 880.

The Government notes that a long line of cases holds that the incidence of taxation depends on the substance of the transaction, not its form. *See, e.g., Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 82 L.Ed. 474 (1938); *Comm'r v. Court Holding Co.,* 324 U.S. 331, 334, 65

S.Ct. 707, 89 L.Ed. 981 (1945); *Higgins,* 308 U.S. at 477, 60 S.Ct. 355; *Gregory,* 293 U.S. at 470, 55 S.Ct. 266; *Sec. Indus. Ins. Co. v. United States,* 702 F.2d 1234 (5th Cir.1983); *Kuper,* 533 F.2d at 155; *Crenshaw v. United States,* 450 F.2d 472, 475 (5th Cir.1971). As the Fifth Circuit has held: "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Crenshaw,* 450 F.2d at 475; *see also id.* at 475 ("[W]hen an illusory facade is constructed solely for the purpose of avoiding a tax burden the astute taxpayer cannot thereafter claim that a court is bound to treat it as being a genuine business arrangement.").

The Government contends that, in substance if not form, Beal himself purchased the NPLs from Cinda. Thus, the Government states, the Court should recharacterize the transaction to conform with economic reality. In this scenario, the Government posits that Southgate is, in substance, a vehicle for Beal to generate large tax losses that he could claim on his personal tax returns.

Turning its attention to the Martel/GNMA Repo transaction, the Government contends that an intermediary interposed between the true parties to a transaction for the purpose of altering tax consequences may be disregarded as a "conduit" under the substance-over-form doctrine. *See Comm'r v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Conversely, the Government notes, if an entity has an independent and meaningful, non-tax-related role in a transaction, then the entity and its transactions will not be disregarded under the conduit substance-over-form theory. *See United States v. Cumberland*

*Pub. Serv. Co.*, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950).

Additionally, under the "step-transaction" doctrine, the Government claims that the steps of the transaction must be analyzed as a whole rather than being treated separately. As the Fifth Circuit described the doctrine in *Kanawha Gas & Utilities Co. v. Comm'r*, 214 F.2d 685, 691 (5th Cir.1954):

> In determining the incidence of taxation, we must look through form and search out the substance of a transaction. This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is the imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means to carry out the plan and will not be separated.

Thus, the Government contends, the transactions should be collapsed and treated as if Beal had entered into the repo transaction with UBS. Under this theory, any intervening steps were merely intermediate actions to artificially generate a basis of $180 million and should be disregarded.

Plaintiff responds that the Government's substance-over-form argument is an attempt to circumvent the plain language of 26 U.S.C. § 704(c). In reality, Plaintiff contends, the substance and form of the Southgate transactions are the same: Cinda, through Eastgate, contributed the NPLs to Southgate and later sold a portion of its interest in Southgate to Beal—a structure based, at least in part, on substantial non-tax business reasons.

Yet by properly collapsing the series of transactions to analyze its substance as a whole, *see Kanawha Gas*, 214 F.2d at 691, the Court necessarily concludes that the effect was to elevate form over substance.

The Court has already concluded that the Martel/GNMA Repo transaction lacked economic substance and the partnership structure was a sham. It necessarily follows that the substance of the transaction, with Martel as a conduit to facilitate solely tax-based motives, cannot survive judicial scrutiny.

## D. The Government's "Basis–Killer" Arguments

The Government has presented three so-called "basis-killer" arguments: (1) Cinda was a dealer in securities between 1999 and 2001 and therefore required to mark the NPLs to market, (2) the IRS may apply an arm's length price to Cinda's purchase of the NPLs under 26 U.S.C. § 482, and (3) the NPLs were worthless. The effect, according to the Government, is to reduce Southgate's basis in its NPL portfolio to the market value of $19.4 million rather than the $1.1 billion face value of the loans.

### i. Cinda was Not a Dealer between 1999 and 2001

The Government argues that Cinda was a "dealer" in securities in each year between 1999 and 2001, immediately preceding the Southgate transaction. The effect of Cinda having dealer status would require it to mark the NPLs it transferred to Southgate to their fair market value rather than the face value of the securities. The Government posits that this would reduce Southgate's basis in the NPLs from the $1.1 billion face value to the $19.4 million it paid at formation on August 1, 2002.

The Government has argued that Cinda sold more than sixty NPLs in each year between 1999 through 2001, and the basis of the NPLs sold by Cinda in each of the years 1999 through 2001 was 5 percent or more of the basis of the NPLs that Cinda

acquired in each of those years. Thus, the Government states, Cinda failed to meet the "negligible sales" exception under Treas. Reg. § 1.475(c)–1(c) at the time of Eastgate's formation on July 31, 2002, and Southgate's formation on August 1, 2002.

Plaintiff argues that Cinda was an investor and trader rather than a dealer, relying upon a literal reading the plain text of 26 U.S.C. § 475. Plaintiff contends that Cinda was not a dealer in securities any time prior to the Southgate transaction because it did not: (1) purchase securities from or sell them to *customers* in the ordinary course of its trade or business; or (2) *regularly* purchase or sell securities between 1999 and 2001.

Section 475 defines a "dealer in securities" as "a taxpayer who (A) regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business; or (B) regularly offers to enter into, assume, offset, assign or otherwise terminate positions in securities with customers in the ordinary course of a trade or business." 26 U.S.C. § 475(c)(1).

The Court agrees with Plaintiff that in taking an equity interest as part of restructuring its obligors' debt, Cinda was collecting for its own account rather than engaging in a sale to "customers." Based on the evidence presented at trial and the applicable law, the Court finds Cinda, in a nascent stage following its creation in April 1999, was not a dealer in securities in each year between 1999 and 2001. Any later evolution toward dealer status is irrelevant for the purposes of this action.

Although the Court agrees that Southgate's basis is $19.4 million rather than the $1.1 billion claimed, *see supra* Part II.C Judicial Doctrines, Section's 475 mark-to-market rules are not applicable because Cinda was not a dealer in securities in each year from 1999 to 2001.

**ii. Section 482**

The Government additionally argues that regardless of whether Cinda is a dealer, it may apply an arm's length price to its purchase of the NPLs from CCB under 26 U.S.C. § 482. The section states, in pertinent part:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

26 U.S.C. § 482. At trial and in its post-trial response brief, the Government acknowledged that applying Section 482 to two foreign entities transacting business with each other on non-arms-length terms was effectively a matter of first impression. Nevertheless, the Government asserts that under the broad language of Section 482, the IRS may reallocate basis between any two commonly owned or controlled entities (here Cinda and CCB), regardless of their status as United States taxpayers.

Plaintiff contends the Government's argument under Section 482 is barred because it was never properly or timely adopted as a position of the IRS until after the close of discovery, and the IRS violated the Court's orders to identify a knowledgeable Rule 30(b)(6) witness. Additionally, Plaintiff states, the Treasury Regulations associated with Section 482 vest the exercise of discretion conferred

by the statute with the IRS. As such, "the Commissioner [of Internal Revenue] must first exercise his discretionary powers before [Section 482] becomes operative ..." *Peter Pan Seafoods, Inc. v. United States*, 272 F.Supp. 888, 895 (W.D.Wash.1967). If the Commissioner fails "to make a determination under or pursuant to Section 482," the section does not apply in any subsequent litigation. *United States v. First Sec. Bank*, 334 F.2d 120, 122 (9th Cir.1964). Plaintiff contends that the Commissioner failed to make such a determination, evidenced by its absence in the FPAA. Plaintiff thus contends it did not receive fair notice of the argument before trial.

Substantively, Plaintiff argues, Section 482 does not apply to Cinda's acquisition of the NPLs from CCB because there is no member of a control group whose taxes are at issue in this case. Further, even if Section 482 could apply to the Cinda/CCB transaction, the evidence demonstrates that they are not commonly controlled entities. Despite overarching ownership by the Chinese state, Cinda and CCB were separate legal and commercial entities with separate internal management, separate supervisory boards, separate regulatory authorities and different lines of business.

Taking these arguments in turn, the Court first concludes the Government is not precluded from asserting its argument under Section 482. The Court did not sanction the Government before trial regarding the Rule 30(b)(6) deposition requested by plaintiff, *see* Order on Plaintiff's Motion to Limit Evidence and Defendant's Emergency Motion for Clarification and Reconsideration (Doc. No. 77), and it does not find reason to do so now. The Government asserts that it gave Plaintiff notice of the Section 482 argument in an interrogatory response served by the United States upon Plaintiff on August 22, 2007, sixteen months before trial. "Fair warning in this context means that a taxpayer must not, by reason of the Commissioner's failure to timely notify him, have been prejudiced or harmed in his ability to prepare for trial." *Rubin v. Comm'r*, 56 T.C. 1155, 1163, 1971 WL 2577 (1971), *aff'd*, 460 F.2d 1216 (2d Cir.1972). Plaintiff has shown no prejudice and therefore no evidence it did not receive fair warning.

Turning to substantive grounds: "The entire purpose of section 482 is to prevent the use of two organizations to distort income or avoid taxes." *South Texas Rice Warehouse Co. v. Comm'r*, 366 F.2d 890, 894 (5th Cir.1966); *see also* 26 C.F.R. § 1.482–1(a) (2002) ("The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions."). Yet, as Plaintiff notes and the Government effectively admits, it would be a novel claim to assert the IRS may use Section 482 retroactively to adjust tax resulting from a transaction between two foreign corporations, neither of which is subject to United States tax and neither of which had a formal business relationship with a United States taxpayer at the time of their transaction. By its nature and context, the statute appears to presume that at least one of the entities is a United States taxpayer. *See* 26 U.S.C. § 482. Here, the members of the alleged control group—the Chinese government, CCB, and Cinda—have no duty to report their income to the IRS, so no "controlled" taxpayer failed to report its true taxable income. Southgate and Beal, who *do* have a duty to report their true taxable income, were not members of the control group.

Southgate was not involved in Cinda's acquisition of the NPLs from CCB by the end of the year 2000. Plaintiff notes that

Cinda's purchase occurred almost three years before Southgate was formed, between two foreign entities—neither of which has ever reported income in the United States—for reasons unrelated to the U.S. tax system. Section 482 relates to the allocation of controlled "organizations, trades, or businesses['] ... gross income, deductions, credits, or allowances ... to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." Section 482 contemplates the IRS reallocating "gross income, deductions, credits, or allowances" to reflect the income of certain controlled entities. Here, Plaintiff contends, the "gross income, deductions, credits, or allowances" of both Cinda and CCB are not at issue because neither entity has a U.S. tax liability. There was no proof at trial as to the "gross income, deductions, credits, or allowances" of Cinda or CCB. Furthermore, it is not apparent to the Court that Cinda and CCB were commonly controlled despite overarching state ownership. To find so, the Court effectively would have to rule that virtually all Chinese entities are commonly controlled because of the pervasive state ownership in communist China.

Although the text of the statute does not appear to explicitly exclude the application of Section 482 to two wholly foreign organizations, neither does it explicitly contemplate what the Government attempts here. In essence, the Government is trying to do with Section 482 what Plaintiff attempts with Section 704(c)—rely on a technical reading of the statute to lend credence to a relatively novel theory without support from underlying regulations or judicial doctrines. Thus, although the Government's Section 482 argument is not barred by the Court, but its overly broad reading and novel attempted application of the statute is unconvincing. The Court concludes the Government may not rely upon Section 482 to apply an arm's length price to the NPLs Cinda purchased from CCB.

### iii. The NPLs were Not Worthless

As its third "basis-killer" argument, the Government contended at trial that the NPLs were worthless at the time they were acquired by Cinda, and therefore Southgate could not realize a taxable loss on the NPLs sold to third parties in 2002. This argument was not fully briefed posttrial, however, and the Government has apparently changed its position to an assertion that the NPLs were "essentially worthless."

"Worthless" is different than "worth little" or "essentially worthless." *See Bodzy v. Comm'r*, 321 F.2d 331, 335 (5th Cir. 1963) (stating that a debt is not wholly worthless until "the last vestige of value" disappears). There is no doubt that the NPLs were "worth" just pennies on the dollar. Loan balances that may be difficult, even improbable, to collect still retain some value. The evidence the Court heard regarding the successful prior collections of NPLs by Beal attests to this fact. The Court thus concludes that the NPLs were not worthless as a matter of law.

### E. No Penalty

The IRS may impose a penalty for substantial understatement where the understated amount exceeds 10 percent of the tax required to be shown on a return. 26 U.S.C. § 6662(d)(1)(A)(i) (2002). Yet this Section also provides an exception to the penalty—if there was "substantial authority" for the taxpayer's position, then the penalty is reduced to the degree such substantial authority existed. 26 U.S.C. § 6662(d)(2)(B)(i) (2002). "Substantial authority" is "more stringent than the reasonable basis standard," but less "than [a] 50-percent likelihood of the position being

upheld." Treas. Reg. § 1.6662–4(d)(2); *Klamath Strategic Inv. Fund*, 472 F.Supp.2d at 900.

The Internal Revenue Service determined that four penalties apply to the Southgate transaction: (i) a 40 percent penalty for a gross valuation misstatement (Section 6662(b)(3) and (h)); (ii) a 20 percent penalty for substantial valuation misstatement (Section 6662(b)(3)); (iii) a 20 percent penalty for substantial understatement of income tax (Section 6662(b)(2)); and (iv) a 20 percent penalty for negligence or disregard of rules and regulations (Section 6662(b)(1)). There is no stacking of penalties, so the maximum penalty is either 20 percent or 40 percent of the underpayment of tax, even if an underpayment is attributable to more than one type of misconduct. *See* Treas. Reg. § 1.6662–2(c). The taxpayers made the required jurisdictional deposit regarding penalties by depositing a 40 percent penalty for the 2002 tax year.

The issue of penalties is governed by TEFRA, 26 U.S.C. § § 6221–6233. Under the Act, "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level." 26 U.S.C. § 6221. TEFRA specifically sets forth the scope of judicial review:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates; the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

26 U.S.C. § 6226(f). "This provision clearly grants the district court jurisdiction to determine the applicability of any penalty relating to an adjustment of a partnership item." *Klamath*, 568 F.3d at 547.

### i. Valuation Misstatement Penalties

■ The Government assessed gross valuation misstatement (40 percent) and substantial valuation misstatement (20 percent) penalties against Beal under Section 6662(b)(3) and (h).

Plaintiff contends that under *Todd v. Comm'r*, 862 F.2d 540, 541–42 (5th Cir. 1988), *Heasley v. Comm'r*, 902 F.2d 380, 382–83 (5th Cir.1990), and their progeny, these penalties are not applicable if the IRS's disallowance of tax benefits is not "attributable to" a valuation misstatement. *See Klamath Strategic Inv. Fund v. United States*, 472 F.Supp.2d 885, 899–900 (E.D.Tex.2007) *aff'd in part*, 568 F.3d at 553 (holding that a disallowance was not "attributable to" a valuation misstatement when the IRS disallowed a transaction as lacking economic substance).

*Todd* held that because deductions and credits were disallowed for a reason totally unrelated to any valuation overstatement, the resulting underpayment could not be "attributable to a valuation overstatement" and misstatement penalties should not apply. *Todd*, 862 F.2d at 542. In *Heasley*, the Fifth Circuit determined:

> [w]henever the IRS totally disallows a deduction or credit, the IRS may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.

*Heasley*, 902 F.2d at 383. The Fifth Circuit has reaffirmed the validity of the *Todd/Heasley* reasoning. *E.g., Weiner*, 389 F.3d at 160–62 (citing both with approval in 2004).

Plaintiff also contends the text of the penalty statute excludes such valuation misstatement penalties in a Section 482 reallocation when the question involves two foreign entities, here Cinda and CCB. *See* 26 U.S.C. § 6662(e)(3)(B)(iii) (2002) (stating that Section 482 adjustments relating to a transaction between two foreign corporations are excluded from the computation of the valuation misstatement penalty when there is no effect on the U.S. tax liability of the foreign corporations). Additionally, Plaintiff notes the *Heasley* rationale has specifically been applied when the IRS disallowed a loss under Section 465 as not being "at risk." *Alpha I, L.P. v. United States,* 84 Fed. Cl. 622, 626–632 (2008).

The Government argues that because this case involves a "basis misstatement" rather than a "basis disallowance," the Fifth Circuit's decisions in *Todd* and *Heasley* are distinguishable and do not preclude the imposition of a 40 percent valuation misstatement penalty against Southgate. *Todd* and *Heasley* must control this case. Although the rule in the Fifth Circuit differs from the rule in other circuits, *see, e.g., Zfass v. Comm'r,* 118 F.3d 184, 190 (4th Cir.1997), this Court is bound to follow the law in the Fifth Circuit. Accordingly, the penalty for a gross valuation misstatement does not apply when the IRS totally disregards a transaction as lacking economic substance. *See Klamath,* 472 F.Supp.2d at 899–900.

Plaintiff notes the language of the FPAA—"the claimed losses are disallowed in full"—to show a basis disallowance rather than a basis misstatement. The Government Thus, the valuation misstatement penalties are not allowable under binding Fifth Circuit precedent governing such a disallowance. Even if they were, the Court would not assess a penalty in this case because Plaintiff provided substantial authority for its reported tax results and

reasonably believed its position was more likely than not correct based on the advice it received from qualified professionals.

## ii. Substantial Understatement of Income Tax

■ The Government also imposed a 20 percent penalty for substantial understatement of income tax under Section 6662(b)(2). A "substantial understatement of income tax" occurs if the amount of understatement exceeds the greater of 1) 10 percent of the tax required to be shown on the return, or 2) $5,000. 26 U.S.C. § 6662(d).

Notwithstanding this mathematical test, the statute provides an exception to the penalty: "The amount of the understatement ... shall be reduced by that portion of the understatement which is attributable to ... the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment." 26 U.S.C. § 6662(d)(2)(B)(i). Although the exception has been eliminated in tax-shelter cases, *see* 26 U.S.C. § 6662(d)(2) (C), it is applicable here. For substantial authority to exist, "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662–4(d)(3)(i); *see also Custom Chrome, Inc. v. Comm'r,* 217 F.3d 1117, 1127–28 (9th Cir.2000).

> The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50–percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662–3(b)(3).

Treas. Reg. § 1.6662–4(d)(2). Opinions rendered by tax professionals are not considered authority. Treas. Reg. § 1.6662–4(d)(3)(iii). Taxpayers may have substantial authority for their positions even when the underlying transactions are disallowed as lacking economic substance. *See Klamath*, 472 F.Supp.2d at 901–02. *But see Long Term Capital Holdings v. United States*, 330 F.Supp.2d 122, 204–05 (D.Conn. 2004) (finding taxpayer cannot cite authority, much less substantial authority, for its position because the court found the transaction devoid of objective economic substance and subjective business purpose); *Santa Monica Pictures, LLC v. Comm'r*, T.C. Memo.2005–104, 2005 WL 1111792, at *100–01 (May 11, 2005) (finding no substantial authority when transactions had no economic substance beyond creation of tax benefits).

It is clear to the Court that Plaintiff's understatement meets the mathematical test set forth in 26 U.S.C. § 6662(d). Yet Plaintiff's contention that substantial authority for its tax position is persuasive. The Government acknowledged at trial that the Section 482 argument, at least as applied to two foreign entities transacting business with each other on non-arms-length terms, was a matter of first impression. By definition there can be no substantial authority on an issue of first impression, only educated guesses based upon a reading of prior decisions. Still, the Government contends, the longstanding nature of the judicial doctrines preclude a substantial authority defense by Plaintiff.

According to Plaintiff, the two tax opinions demonstrate that the weight of authorities in 2002 supported the tax positions taken by Southgate. The Government counters that the opinions were essentially pre-ordained, undermined by conflicts, and rely on false assumptions, such as the Southgate transaction's ability for a reasonable profit and purported business purpose. These arguments, rather than attacking the substance of the opinions or the legal conclusions underpinning them, instead focus on the circumstances surrounding their creation.

The judicial doctrines, as the Court has noted, are amorphous, require intensive fact-finding, and generally lack the sort of black-letter, multi-part tests that allow definitive answers. The opinions were properly framed as educated guesses in light of what the IRS *might* find and what a court *might* conclude, bolstered by substantial statements of both fact and law, and reasonably relied upon by Southgate's architects. Thus, the Court concludes the substantial authority exception is applicable, and the substantial understatement penalty does not apply.

### iii. Negligence or Disregard of Rules or Regulations

■ The Government additionally imposed a 20 percent penalty for negligence or disregard of rules and regulations under Section 6662(b)(1). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly. 26 U.S.C. § 6662(c); Treas. Reg. § 1.6662–3(b)(I). It also includes the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Heasley*, 902 F.2d at 383. Negligence is strongly indicated if a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction or credit which would seem "too good to be true" to a reasonable and prudent person. Treas. Reg. § 1.6662–3(b)(*l*)(ii).

There can be no finding of negligence if there was a reasonable basis for a return position. Treas. Reg. § 1.6662–3(b)(*l*).

Reasonable basis is a significantly higher standard than not frivolous or not patently improper; it cannot be a merely arguable or a merely colorable claim. Treas. Reg. § 1.6662–3(b)(3). Reasonable basis requires reliance on legal authorities and not on opinions rendered by tax professionals. *Id.;* Treas. Reg. § 1.6662–4(d)(3)(iii). The Court may, however, examine the authorities relied upon in a tax opinion to determine if a reasonable basis exists. Treas. Reg. § 1.6662–4(d)(3)(iii). The "reasonable basis" standard for reliance on opinions is lower than the "substantial authority" standard. Treas. Reg. § 1.6662–4(d) (2).

Effectively, the Government argues the tax results of Southgate were simply "too good to be true" and that Plaintiff displayed head-in-the-sand negligence. Plaintiff responds that through careful reading of the Internal Revenue Code and reliance upon tax and legal professionals, it determined that the interaction of Code sections could plausibly create tax losses that exceeded cash losses. As Professor Weisbach verified, citing *Crane v. Comm'r,* 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), and *Comm'r v. Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), a scenario in which the tax losses exceed the cash contributions to the transaction does not necessarily render a transaction illegitimate. Weisbach noted that many transactions—as when a company acquires a bank with distressed loans, like the Wells Fargo acquisition of Wachovia in 2008—produce tax losses in excess of economic losses.

As the reasonable basis standard for reliance on opinions is lower than the substantial authority standard the Court has already established, the Court necessarily concludes that Plaintiff had a reasonable basis for its tax claims. As such, a negligence penalty is inapplicable.

### iv. Southgate Acted in Good Faith and with Reasonable Cause

If a taxpayer acts in good faith and with reasonable cause in the calculation of taxes, penalties may not be applied: "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1). The conduct of Montgomery, the managing member of the Southgate partnership in the year 2002, and Beal, the principal investor and manager of significant Southgate assets, forms the basis of the partnership's reasonable cause defense.

The TEFRA structure enacted by Congress does not permit a partner to raise an individual defense during a partnership-level proceeding, but when considering the determination of penalties at the partnership level the court may consider the defenses of the partnership. *Klamath,* 568 F.3d at 548 (citing *New Millennium Trading, LLC v. Comm'r,* 131 T.C. No. 18, 2008 WL 5330940 at \* 7 (2008)). Reasonable cause and good faith may be considered by a district court if asserted on behalf of the partnership. *Id.; see also Stobie Creek Invs., LLC v. United States,* 82 Fed. Cl. 636, 703 (2008). *But see Clearmeadow Invs., LLC v. United States,* 87 Fed.Cl. 509, 521–22 (2009) (finding *Klamath* and *Stobie Creek* "are in error" because the reasonable cause defense in section 6444(c)(1) is unavailable at the partnership level). The *Clearmeadow* decision cites Treas. Reg. § 301.6221–1(d) and Temp. Treas. Reg. § 301.6221–1T(c)–(d) to contend these defenses may not be considered at the partnership level. *Clearmeadow Invs.,* 87 Fed.Cl. at 520–21. Taking due notice of the conflicting opinions in the Court of Federal Claims, this

Court is bound to follow the Fifth Circuit's decision in *Klamath*, which explicitly found that a district court has jurisdiction to consider the reasonable cause and good faith defense at the partnership level in a TEFRA proceeding. *Klamath*, 568 F.3d at 547–48.

 The plaintiff bears the burden of proof on a reasonable cause defense. *Klamath*, 568 F.3d at 548 (citing *Montgomery v. Comm'r*, 127 T.C. 43, 66, 2006 WL 2472807 (2006)). The most important factor is the extent of the taxpayer's effort to assess his proper liability in light of all the circumstances. Treas. Reg. § 1.6664–4(b). "Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith; rather, the validity of this reliance turns on 'the quality and objectivity of the professional advice which they obtained.' " *Id.* (quoting *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir.1986)).

The Fifth Circuit in *Klamath* noted the district court's findings that the managing partners sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their investments and the resulting tax deductions and hired attorneys to write a detailed tax opinion, providing the attorneys with access to all relevant transactional documents. *Id.* (affirming district court's conclusion that no penalties should apply). The *Klamath* opinion noted that the trial court found the partnerships proved by a preponderance of the evidence that they relied in good faith on the advice of qualified accountants and tax lawyers. *Id.*

Here, the Court has found that Plaintiff sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their investments and the resulting tax deductions and hired professionals to write *two* detailed tax opinions. Plaintiff's advisors relied on a literal-if narrow-reading of the law and

congressional intent. Assessing penalties of 20 or 40 percent in light of Plaintiff's assiduous efforts to comply with blackletter law would unduly penalize creative dealmaking and stymie financial innovation. Thus, even if the penalties were otherwise deemed applicable, the Court concludes that the calculation of taxes was done in good faith and with reasonable cause.

As shown at trial, Beal is an aggressive risk-taker, a noted gambler who makes big bets. Sometimes he wins, and sometimes he loses—but he plays the game above board.

## III. Conclusion

Based on the findings and conclusions set forth today, the Court concludes that although Southgate's claimed capital loss appeared to fall within the literal terms of the statute, the transaction that created the high basis in the stock lacked economic substance and therefore must be disregarded for tax purposes. Consequently, the Court concludes that the Government's adjustments to Southgate's 2002 tax return are correct. The Court further concludes that because the calculation of taxes was done in good faith and with reasonable cause and the penalties assessed by the Government are otherwise inapplicable, no penalties are warranted.

Objections to designated deposition testimony that factored into these findings and conclusions are **OVERRULED**. Objections to deposition designations that were not considered are **DENIED as moot** and would be overruled to the extent they were relevant. The parties are directed to confer and submit, within ten (10) days, a proposed form of judgment consistent with these findings of fact and

conclusions of law. All other outstanding motions are hereby **DENIED.**

**SO ORDERED.**